ORIGINAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2020 SEP 23  AM 9: 21

DEPUTY CLERK_____

| | |
|---|---|
| AMY PICKETT, Pro Se | Civil Action No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER; | **(Jury Demanded)** |
| BARBARA CHERRY, individually and in her official capacity as Department Chair of Leadership Studies | 5-20CV0232-H |
| 3601 4th Street STOP 6264 Lubbock, TX 79430-6264 | |
| MICHAEL EVANS, individually and in his official capacity as Dean of School of Nursing, | |
| 3601 4th Street STOP 6264 Lubbock, TX 79430-6264 | |
| Defendants. | |

COMES NOW, Plaintiff AMY PICKETT, *Pro Se*, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**INTRODUCTION**

I am seeking damages and injunctive relief to remedy violations of my rights secured by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"), and violations of my substantive and procedural due process rights secured by the Fourteenth Amendment of the United States Constitution by Defendants, TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER ("TTUHSC" or the "School"), School of Nursing Dean

1

MICHAEL EVANS ("Dean Evans") and Department Chair BARBARA CHERRY ("Dr. Cherry," and together with TTUHSC and Dean Evans, "Defendants"). TTUHSC repeatedly failed to provide me with the accommodations to which I was entitled and then penalized me for the negative impacts of their failure and TTUHSC faculty's hostility.

TTUHSC then dismissed me from both of my academic programs even though I did not meet the criteria for academic dismissal. In dismissing me, Defendants failed to provide me with the required notice and then failed to timely respond to my appeal, instead finalizing my dismissal and removing me from the programs without considering my appeal. In doing so, Defendants violated not only the ADA and RA, but also my right to substantive and procedural due process. Accordingly, I now petition this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of my rights.

## **PARTIES**

1.      I am currently a resident of the State of Texas and, at all relevant times, I was a student in TTUHSC School of Nursing's post-Master's Doctor of Nursing Practice ("DNP") and post-Master's Family Nurse Practitioner ("FNP") programs.

2.      Defendant TTUHSC operates the Texas Tech University Health Sciences Center's DNP and FNP programs, public educational programs based at TTUHSC's Lubbock, Texas campus. TTUHSC's chief executive officer maintains an office in Lubbock, Texas. TTUHSC receives financial assistance from the United States Government.

3.      Defendant Barbara Cherry was the Department Chair over the TTUHSC DNP program. She is being sued in her individual and official capacities.

4.      Defendant Michael Evans is the Dean of TTUHSC's School of Nursing. He is being sued in his individual and official capacities.

5.      At all times herein, Defendants have been acting under color of law.

6.      At all times relevant hereto, and in all the actions described herein, Defendants'

actions took place in the State of Texas, County of Lubbock.

7.      Defendants did the acts and omissions hereinafter alleged in bad faith and with

knowledge that their conduct violated well established and settled law.

## VENUE & JURISDICTION

8.      This Court has jurisdiction over the claims set forth in this action pursuant to 28

U.S.C. § 1331 (question of federal law) based upon 28 U.S.C. § 1343 (civil rights), as the claims

are based upon 42 U.S.C. §§ 12101-12213, 29 U.S.C. § 701, *et seq.*, and 42 U.S.C. § 1983.

9.      Supplemental jurisdiction over my pendant state law claims are proper pursuant to

28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as

my federal claims.

10.     Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as Defendants

are located in this District and the events giving rise to my claims occurred therein.

11.     Costs and attorney's fees are sought pursuant to 42 U.S.C. § 1988.

## GENERAL FACTUAL ALLEGATIONS

12.     I was a successful registered nurse with over 10 years of experience.

13.     In 2008, I was medically diagnosed with attention deficit hyperactivity disorder

("ADHD") while I was finishing my registered nursing degree at Weatherford College.

14.     In 2016, while I was working as a nursing instructor at TTUHSC, I chose to pursue

doctorial education, applied and was accepted to enroll in TTUHSC's DNP program in the summer

of 2016.

15.     The DNP program is a primarily online post-master's degree program designed for

3

working professionals. As a result, students take a limited number of courses at one time.

16.     I was academically excelling in the DNP program and in 2017 I decided it would be beneficial to pursue a separate post-master's certificate as a Family Nurse Practitioner simultaneously, as was permitted by TTUHSC. Following my acceptance and enrollment in the FNP program, I was then scheduled to graduate from the DNP program in May 2019, and then graduate from the FNP program in August 2019.

17.     The DNP and FNP programs at TTUHSC are separate and distinct programs. Students can be enrolled in one or the other, or both at the same time. The programs have differing coursework and academic requirements and separate admissions processes, as well as separate and unconnected graduation requirements and timelines.

18.     Knowing that my ADHD required me to work incredibly hard to counter its negative effects and the addition of a second program would add to my academic demands, I decided to seek reasonable accommodations from TTUHSC and filed paperwork with TTUHSC's ADA office supporting my request in May 2017, before my FNP program was to begin. My request noted the impact of my ADHD on my ability to focus and complete academic tasks under time limited conditions such as testing.

19.     Students at TTUHSC who require reasonable accommodation submit their request to TTUHSC's ADA office. The ADA office reviews the request and supporting documentation and determines whether the student is a qualified student with a disability under the ADA and RA, and what reasonable accommodations the ADA office agrees the student requires and to which the student is entitled.

20.     Following the ADA office's determination, the student is issued a "Letter of Accommodation" ("LOA") stating that the student has been approved for and is entitled to the

specified accommodations.    The student provides this LOA to their professors who are then required under TTUHSC policy and procedures to provide the specified accommodations. TTUHSC's ADA office determines the necessity of and entitlement to the accommodations while TTUHSC's faculty are the ones who actually provide the accommodations on behalf of TTUHSC. A student must request accommodations each semester and receive a new LOA.

21.    TTUHSC agreed that I was a qualified student with a disability under the ADA and RA and was entitled to and required reasonable accommodations; including extended time on tests, an alternative, quiet test environment with reduced distractions and note-taking assistance through the provision of copies of the class lecture power point or professor's lecture notes.    TTUHSC issued me a LOA noting my need for and entitlement to these accommodations in time for my fall 2017 semester during which I was enrolled in both the DNP and FNP programs.

22.    My fall 2017 semester went well, and I did not experience any difficulty receiving the accommodations to which I was entitled when I requested them.    As a result, I again earned all As and continued to hold a 4.0 GPA despite my disability and the increasing academic demands. I did similarly well in my spring 2018 courses, earning an A and my first B.

23.    However, in summer 2018, I encountered substantial difficulty with TTUHSC and its faculty, particularly in the DNP program.    I requested, received and timely provided my LOA to my professors for my summer 2018 courses in the FNP program.

24.    Prior to the summer 2018 semester, I had not asked for accommodations in my DNP courses, fearing negative reactions from my professors.    However, in summer 2018, my health issues were exacerbated, and I finally sought accommodations from the DNP program by providing my LOA to my advisor and professors.    Unfortunately, following my disclosure of my disability and need for accommodations, I encountered the negative reactions and hostility I had

feared.

25.      Following my request for accommodations in summer 2018, TTUHSC questioned

my clinical hours for course 7311. Yet, I was completing and reporting those clinical hours.

26.      Further, despite having submitted the LOAs to my professors and despite my

repeated requests, there were numerous instances where professors failed to provide me with the

copies of lecture notes and power points as required by my LOA.

27.      I additionally encountered difficulty with my DNP advisor, Jeanette Crenshaw,

who was insisting that I provide her with all assignments for her to review a week before they were

normally due to be graded.  While advisors in the DNP program routinely reviewed student

assignments, the timing and conditions of that review were to be determined individually, based

on student needs. I disclosed my disability and need for accommodations to Dr. Crenshaw, who

was my DNP advisor, in an effort to explain why the earlier deadline Dr. Crenshaw was requesting

would be difficult to complete as I required more time due to my disability. This ultimately led to

a conflict of interest having Dr. Crenshaw as my DNP advisor and as a course facilitator.

28.      However, Dr. Crenshaw refused to work with me or adjust the requested deadlines

to accommodate me.  Further, once the DNP faculty learned of my need for accommodations, I

was suddenly graded more harshly in my DNP courses and under different standards than those

applied to other students even though I had previously earned As.

29.      During that summer 2018, I underwent surgery for a medical issue, preventing me

from working for a time.  TTUHSC, as both my employer who had approved leave under the

Family Medical Leave Act and school for programs in which my employment hours were

connected to my academic clinical requirements, were aware of this need.

30.      While I was out, and before I had returned to work, I received a letter from

TTUHSC accusing me of falsifying my clinical hours for one of my summer 2018 DNP courses, course 7311, and recommending that I be dismissed from the DNP program.

31.     I was shocked and alarmed.  Despite being out for surgery, I had completed all of the reported clinical hours and there was no basis for claiming I had falsified them.

32.     I attended the hearing and proved that I had successfully completed the clinical hours, and TTUHSC permitted me to stay.

33.     That same semester, I took an incomplete in my second course, course 6201, as an accommodation for my medical condition requiring surgery and time out of work and class and as a result of my increasing ADHD and related anxiety which had been exacerbated by the events of the summer.  The incomplete moved my due date for my primary paper to sometime in September 2018, during the fall semester.

34.     As a result of balancing the additional demands of my fall 2018 courses on top of the incomplete and my exacerbated symptoms, as well as technical difficulties, I submitted my paper for course 6201 approximately 30 hours late.  The syllabus for 6201 provided that a student submitting a paper a day late would have one letter grade deducted from their grade, and this was the policy implemented with all other students.

35.     Despite the syllabus and the policies applied to all other students for late submissions, and without any justification other than I had required additional time due to my medical conditions, the course 6201 professor, Cindy Acton, immediately gave me a zero on the assignment.  Initially, Professor Acton told me that I was given a zero because I was late.  As a major portion of my grade, this resulted in me failing the course.

36.     I appealed the failing grade, which was granted.  However, I was informed that the highest grade I could receive on the assignment was a 79, a two letter grade deduction for late

submissions under the syllabus.

37.     Professor Acton "re-graded" the assignment.  Despite the instructions from the outcome of the appeal, and in apparent retaliation, the professor again immediately gave me another 0, this time claiming the zero was because I had not incorporated feedback from Dr. Cherry and Dr. Crenshaw, my advisor and the course facilitator, who had reviewed a draft of the paper, a requirement that did not apply to other students.

38.     I again protested and asked for someone else, who was not clearly hostile to me, to grade the assignment in accordance with TTUHSC policy.  TTUHSC policy required that a second faculty member, who was not the course facilitator, blind grade the paper.  The course facilitator would then meet with the two evaluators and attempt to reconcile the grades.

39.     However, rather than assign a second faculty member to blind grade the paper, Dr. Crenshaw, the course facilitator, graded the paper herself.  Working under the edict that the top grade would be a 79, Dr. Crenshaw – who was clearly aware of the comments she had made to me and whether I had incorporated that feedback – determined that I should receive a 59.

40.     Then, inexplicably, given the clear hostility of my 6201 professors as shown through the initial refusal to provide me my accommodations and subsequent refusal to abide by the syllabus when I required an incomplete, or to abide by the decision on the grade appeal, as well as the requirements of TTUHSC policy, TTUHSC insisted on simply averaging the grades given by the two professors.  Thus, my grade still was negatively impacted by the hostility of the first professor, and I received a 29.5.

41.     Further, the hostility and arbitrariness of the first professor's grade was made clear by my grade on the presentation of this paper.  The grading of the paper was an intermediate step to presenting the paper, initially to a faculty member.  I received an 89 on my presentation of the

paper, indicating the paper did indeed meet program standards.

42.     The averaged grade of 29.5 caused me to receive a C in 6210, a grade for which the DNP program awarded no credit.  Similarly, I had increased difficulty in my other courses as a result of TTUHSC's failure to provide me with necessary accommodations and downgrading of my assignments following my requests for accommodations.

43.     I again requested and timely provided my LOA to my professors for my fall 2018 courses.  The LOA again notified professors that I was entitled to extended time, an alternate testing location and note-taking assistance.

44.     After receiving the LOA, Dr. Wendy Thal, the professor for one of my FNP courses, course 5440, acknowledged the LOA and stated I would receive extended time.

45.     However, on October 2, 2018, when I sat for a course 5440 examination that began at 9:00 a.m., I noticed right away that the extra time I had been granted pursuant to the LOA had not been allotted.

46.     I immediately stepped out of the test and attempted to contact both Dr. Wendy Thal and Dr. Virginia Miller, the two professors for the course, but I was unable to reach them and could only leave voice messages.

47.     I then attempted to contact Ms. Karen Ganus, the Director of the Office of Student Services who handles ADA issues, but Ms. Ganus was in a meeting, so I left a message for her as well.

48.     At or about 9:30 a.m., Dr. Miller called me and said she would talk to the Information Technology Department and have the start time of my test reset for 10:00 a.m.  However, when Ms. Ganus telephoned me at 9:45 a.m., I explained that as a result of the pressure and stress caused by the testing issue and my heightened anxiety and related ADHD symptoms, I

needed more time to calm down than restarting at 10:00 a.m. would allow.

49.    Ms. Ganus indicated that the test would be reset to being at 10:30 a.m.   However, while I was speaking to Ms. Ganus, Dr. Miller again called me and left a voicemail for me saying that they would not make any more changes to the start time of the exam beyond the change already made.

50.    At 10:30 a.m., with my anxiety still at its peak, I was not ready to begin the exam but felt that I could not ask for another postponement in light of Dr. Miller's voicemail.

51.    Due to TTUHSC's initial failure to provide me with the reasonable accommodations that I had been granted by the school's ADA office, and the resulting turmoil in trying to resolve the situation in real time, I suffered severe anxiety that, coupled with my ADHD symptoms, caused me to receive a 62% on the first exam for course 5440.

52.    I requested that, to address the failure to provide accommodations, I be permitted to retake my first exam.  My request was denied.

53.    I then requested that, again to address the failure to implement my accommodations and the resulting negative impact on my exam performance, I would be permitted an extra opportunity to replace my first exam grade with my comprehensive exam grade.  My request was again denied, and TTUHSC refused to address the negative impact of their failure to provide my accommodations on my exam grade.

54.    Unfortunately, I was unable to recover from that first exam and experienced severe migraines during my second exam due to the extreme anxiety that was triggered by TTUHSC's past failure to provide my reasonable accommodations and their subsequent mishandling of the situation.

55.    In addition, my fall 2018 professors again failed to provide me with the class

lectures or power points, thereby denying me the reasonable accommodations TTUHSC's ADA office had identified as accommodations that were necessary and to which I was entitled.

56.     As a result of TTUHSC's repeated failures to accommodate me and the total lack of support, my anxiety and ADHD symptoms continued to escalate throughout the fall 2018 semester. Among other resulting difficulties, I experienced severe panic attacks on both my third and comprehensive exams. As a result of my panic attacks, I was unable to finish the exam, and TTUHSC was unwilling to provide me with another testing opportunity. These difficulties resulted in poor grades that are nowhere near an accurate reflection of my knowledge and skill, as evidenced by my prior 4.0 GPA.

57.     Subsequently, on December 18, 2018, I received a letter from Dean Evans informing me that following a review of grades by the DNP Council, I was being dismissed from the School of Nursing DNP Program.

58.     The December 18, 2018 letter stated that:

> Dismissal from TTUHSC School of Nursing PM-DNP Program will result from the following circumstances:
> - Students earning a "C" or lower in two or more DNP courses in one semester
> - Students earning a "C" or lower in the same DNP course twice
> - Students earning a "C" or lower in a second DNP course even though one DNP course has been retaken and a satisfactory grade of "B" or better has been obtained
> - Cumulative semester or cumulative GPA less than 2.0 for two consecutive semesters

It further stated, "You have failed to meet one or more of the stated standards," and the DNP Council had recommended my dismissal.

59.     Under TTUHSC policy, the Dean was charged with reviewing the recommendation of the Council and rejecting, modifying or accepting it, and then issuing his decision to the student. Dean Evans' letter to me represented his decision to dismiss me from the DNP program.

60.     However, I met none of the stated criteria. I had received a C in one DNP course, course 6210. My other lower grade was in an FNP course, course 5440, in a different program, and, furthermore, in a different semester.

61.     I did not earn two C or lower grades in two DNP courses, let alone two courses in a single semester, in the same DNP course, or after having retaken another DNP course for having received a lower grade. Nor was my GPA below 2.0 at any time.

62.     Under TTUHSC's policy, the mechanism for a student to appeal an academic dismissal is for the student to submit an appeal to the Dean. TTUHSC considers an appeal through convening an appeal council. Neither the Department Chair nor the chair of the academic program council participate or are present during appeal procedures, which are carried out in a limited hearing. TTUHSC policy provides for no other mechanism to hear an appeal or student response prior to implementation of a dismissal.

63.     I timely appealed my dismissal under TTUHSC policy, but TTUHSC did not respond to me in a timely manner.

64.     TTUHSC's policy is that a student who has appealed a dismissal remains enrolled and active, and able to continue coursework, until the appeal is resolved. Further, the December 18, 2018 dismissal letter did not indicate that I was being dismissed from the FNP program.

65.     However, in early January 2019, TTUHSC cut off my access to my email and cancelled all of my DNP advising appointments.

66.     Dr. Barbara Cherry, the Department Chair, then gave me an ultimatum: I could remain in either the DNP Program or the FNP Program, but not both.

67.     I, concerned with TTUHSC's apparent treatment of my dismissal as final and total, despite the fact that my appeal was still pending, and Dr. Cherry's ultimatum in light of the fact

12

that my enrollment in FNP should not have been in question, I emailed Dr. Cherry requesting additional time to consider the ultimatum.

68.     However, as I was sending this email to Dr. Cherry, I simultaneously received an email from Dr. Cherry stating that, because she had not heard from me, TTUHSC's dismissal of me would stand. This decision was made without consideration of or response to my appeal or the hearing that should have been convened under TTUHSC policy.

### FIRST CAUSE OF ACTION

***VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, et seq., and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C § 701, et seq.***
**(*DISABILITY DISCRIMINATION*)**
**Against Defendant TTUHSC and Defendants Evans and Cherry in their official capacities**

69.     Each of the allegations set forth in paragraphs 1 through 68, inclusive, are hereby incorporated by this reference as if realleged fully herein.

70.     Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA is a federal anti-discrimination statute designed to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.

71.     The RA provides that, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). The RA was enacted to ensure that handicapped individuals are not denied jobs or other benefits because of prejudiced attitudes or ignorance of others. Because the language of these two provisions is substantially similar, claims under both

acts are generally analyzed together.

72.     TTUHSC receives federal financial assistance, as defined by 29 U.S.C. § 794, through receipt of federal financial aid and other funds, and is a public entity.   As such, it is subject to the mandate of the RA and ADA and may not discriminate against a person because of her disabilities.

73.     I was a qualified individual with a disability.  I suffer from ADHD as well as related anxiety, which are qualifying disabilities.   These disabling conditions substantially limit major life activities, including learning, concentrating and working, because they cause difficulties in focusing on more academic tasks, particularly under time pressures or in an environment with many distractions or stressors.   When exacerbated, they can manifest in panic attacks which have prevented me from completing exams.   As a result, I require medication as well as an environment for testing free of excess distractions and stressors, extended time to accommodate my difficulties with focus and need for extra processing time, and copies of notes or lectures to enable me to equally access classroom presentations, thereby affecting my ability to function in my role as a student at TTUHSC absent reasonable accommodations.  I was otherwise able to perform the essential functions for participation in TTUHSC's curriculum with or without accommodations.

74.     Further, I suffered additional medical problems requiring surgery in the summer 2018, limiting my ability to go to work or class because of the resulting physical limitations.  I required an accommodation of additional time to complete coursework during the semester as a result.

75.     Defendants discriminated against me on the basis of my disability when Defendants:

        a.  Failed to provide the required note-taking assistance in my summer

2018 and fall 2018 courses;

b.  Failed to provide the required extended time for my first exam in course 5440 and then refused to provide me an opportunity to participate in the exam with the accommodations I required or to otherwise demonstrate my abilities and achievement without the barriers imposed by TTUHSC's failure;

c.  Accused me of falsifying my clinic hours and dismissing me without basis in August 2018;

d.  Issued a grade of 0 for a day late assignment following my incomplete in course 6210 and then deducting two letter grades from my grade following successful appeal, having the same professor "re-grade" the assignment and then counting the second 0 in my grade despite clear evidence of the arbitrary and discriminatory nature of the grade;

e.  Dismissed me from both the DNP and FNP programs despite a lack of asserted failure to meet standards in the FNP program or any notice of dismissal from that program, despite the fact that I did not meet the stated criteria for dismissal, and despite the fact that I only had two low grades – in separate programs – were due to the discriminatory acts of TTUHSC; and

f.  Cut off my email access and canceled my advising appointments and otherwise finalized my dismissal from both programs despite my pending appeal and without a hearing.

76.    Defendants wrongly discriminated against me in violation of my rights pursuant to the ADA and RA, inflicting mental and emotional distress, resulting in mental and physical post-traumatic distress, and causing further damage to my health, well-being, academic and professional career, all because I was disabled.

77.    As a direct and proximate result of Defendants' unlawful discrimination against me, I sustained injuries and damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

78.    I am entitled to injunctive and declaratory relief to allow me immediate access and participation in TTUHSC's DNP and FNP programs, free from discrimination.

### SECOND CAUSE OF ACTION
*CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. §*
*1983 (DENIAL OF PROCEDURAL DUE PROCESS)*
**Against Defendants Evans and Cherry in their individual and official capacities**

79.    Each of the allegations set forth in paragraphs 1 through 78, inclusive, are hereby incorporated by this reference as if realleged fully herein.

80.    All persons residing in the United States are afforded the right to procedural due process through the Fourteenth Amendment of the United States Constitution.

81.    I had a constitutionally protected property interest in my continued enrollment in my education in TTUHSC's DNP and FNP programs.  Further, I invested significant amounts of money into paying for the education that I completed, strengthening my claim to the interest.

82.    Before dismissing a student for academic reasons, a university must afford the student some meaningful notice of the faculty's dissatisfaction with my performance and the danger to my continued enrollment and some meaningful opportunity to respond.

83.    Defendants did not provide notice of either the DNP or FNP program's dissatisfaction with my performance or danger to my continued enrollment prior to my dismissal.

16

In fact, Defendants failed to provide any notice at any point that I was being dismissed from the FNP program.

84.     The notice that Defendants did provide – which came only after it was determined that I was to be dismissed – similarly did not provide meaningful notice, as it set forth standards for academic dismissal that I did not meet.

85.     Nor did Defendants provide me an opportunity to respond, either before or after the decision was made to dismiss me.  Though I timely submitted an appeal to Dean Evans, TTUHSC did not timely consider it.

86.     Before anyone at TTUHSC considered my appeal, I was removed as an active student, with my advising appointments cancelled and my email access restricted.

87.     Further, before anyone at TTUHSC considered my appeal and in contravention of TTUHSC's policy, Dr. Cherry – who did not receive the appeal and under TTUHSC policy would not have been involved in consideration of the appeal – informed me that the dismissal would stand.

88.     In December 2018, I was dismissed from TTUHSC's DNP and FNP programs without any notice of any danger of dismissal in either program, without any notice at any point of the dismissal itself with respect to the FNP program, and without any opportunity to respond to dismissal from either program.

89.     Defendants dismissed me without providing the process that I was due, in violation of the Fourteenth Amendment.

90.     Defendants acted under color of law in violating the Fourteenth Amendment, as described herein in violation of 42 U.S.C. § 1983.

91.     As a result of Defendants' official policies, acts, omissions, and practices, I

have suffered irreparable harm because she was deprived of my right to procedural due process.

92. Defendants' actions and omissions proximately caused me to suffer damages, and I continue to suffer damages, academically, financially and emotionally; including, by way of illustration and not limitation, humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

93. The acts, conduct, and behavior of Defendants have denied me my substantive due process rights, by reason of which I was entitled to injunctive relief of immediate re-enrollment in TTUHSC's DNP and FNP programs in Spring 2021.

94. The acts, conduct and behavior of each of the individual Defendants Evans and Cherry in acting to deny me my procedural due process rights were performed knowingly, intentionally, oppressively, and maliciously, by reason of which I was entitled to compensatory and punitive damages against Defendants in their individual capacities in a sum in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

### THIRD CAUSE OF ACTION
### *CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. §*
### *1983 (DENIAL OF SUBSTANTIVE DUE PROCESS)*
### Against Defendants Evans and Cherry in their individual and official capacities

95. Each of the allegations set forth in paragraphs 1 through 94, inclusive, are hereby incorporated by this reference as if realleged fully herein.

96. All persons residing in the United States are afforded the right to substantive due process through the Fourteenth Amendment of the United States Constitution.

97. The protections of the Substantive Due Process clause of the Fourteenth Amendment bar the government from taking arbitrary action that results in the deprivation of a person's interest without reasonable justification.

98. I had a constitutionally protected property interest in my continued enrollment in

my education in TTUHSC's DNP and FNP programs. Further, I have invested a significant amounts of money into paying for the education that I completed, strengthening my claim to the interest.

99.     I was afforded rights under the Fourteenth Amendment's substantive due process clause that enables this Court to override a post-secondary public university's academic decision where the School's actions were such a substantial departure from accepted academic norms as to demonstrate that they did not actually exercise professional judgment when stripping me of that protected property interest.

100.     When viewed against the background of my entire career at the School, TTUHSC's policies, and TTUHSC's discrimination, Defendants' dismissal of me from both the DNP and FNP programs was arbitrary and capricious and an extreme departure from academic norms and had no rational academic basis.

101.     Defendants asserted that I was dismissed because I met one of the following criteria:

- Students earning a C or lower in two or more DNP courses in one semester
- Students earning a C or lower in the same DNP course twice
- Students earning a C or lower in a second DNP course even though one DNP course has been retaken and a satisfactory grade of B or better has been obtained
- Cumulative semester or cumulative GPA less than 2.0 for two consecutive semesters

102.     I earned a C or lower in only one DNP course, and my GPA never fell below 2.0.

103.     My other low grade was in the FNP program, an entirely separate program. Both the DNP low grade and the FNP low grade were a direct result of TTUHSC's discrimination against me.

104.     Defendants' stated basis for dismissal did not accord with the facts and was, at best,

based on the negative impact of TTUHSC's continuing discrimination. An academic decision based on discrimination or one clearly contradicted by the facts is not a legitimate exercise of professional judgment.

105.    Defendants further failed to timely respond to my dismissal appeal, which was filed in accordance with all requirements of TTUHSC policy.

106.    While my appeal was pending, and in contravention of TTUHSC's policy, I was removed as an active student, denied access to my email and had my advising appointments cancelled.

107.    Dr. Cherry then told me that I could only stay in the DNP program or in the FNP program, but not both. However, when I asked for additional time to consider, Dr. Cherry abruptly informed me that the decision to dismiss me would stand, and I was dismissed from both the DNP and FNP programs.

108.    Defendants finalized my dismissal without holding a hearing or considering my appeal. The refusal to hear my appeal, particularly in light of the fact that I did not meet the criteria for dismissal, and then the permanent dismissal of me from not only the DNP program as specified in the December 18, 2018 dismissal letter but also the FNP program, for which I received and Defendants provided or asserted no notice, communication, or basis, was arbitrary and capricious, without exercise of professional academic judgment and an extreme departure from academic norms, without rational academic basis.

109.    Defendants acted under color of law in violating the Fourteenth Amendment, as described herein in violation of 42 U.S.C. § 1983.

110.    As a result of Defendants' official policies, acts, omissions, and practices, I have suffered irreparable harm because I was deprived of my rights to be free from arbitrary,

capricious abuse perpetrated by state actors acting on behalf of the state.

111.    Defendants' actions and omissions proximately caused me to suffer, and I continue to suffer, damages academically, financially and emotionally; including, by way of illustration and not limitation, humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

112.    The acts, conduct, and behavior of Defendants have denied me my substantive due process rights, by reason of which I was entitled to injunctive relief of immediate re-enrollment in TTUHSC's DNP and FNP programs.

113.    The acts, conduct and behavior of each of the individual Defendants Evans and Cherry in acting to deny me my substantive due process rights were performed knowingly, intentionally, oppressively, and maliciously, by reason of which I was entitled to compensatory and punitive damages against Defendants in their individual capacities in a sum in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), I demand a jury trial for all issues in this matter.

## RELIEF REQUESTED

WHEREFORE, I pray that this Honorable Court enter judgment in my favor, and against the Defendants:  (a) for Injunctive Relief to reinstate me as a student in good standing at Texas Tech University Health Sciences Center's Doctor of Nursing Practice and Family Nurse Practitioner programs in Spring 2021, free from discrimination; (b) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial; (c) for punitive damages against the individual Defendants in excess of

SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial; (d) for interest;

(e) together with the costs and disbursements of this action and such other attorneys' fees, pursuant

to 42 U.S.C. § 1988; and (f) further relief as justice requires.

DATED this 23rd day of September, 2020.

**Pro Se**

By

Amy Pickett
P.O. Box 543
Buffalo Gap, Texas 79508
apickett1010@yahoo.com
(682) 258-4558