Case 5:20-cv-00232-BQ  Document 28  Filed 07/30/21    Page 1 of 44   PageID 246
CLERK U.S. DISTRICT COURT
NORTHERN DIST. OF TX
LUBBOCK DIVISION

2021 JUL 30  PM 3: 59

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| AMY PICKETT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:20-CV-232-H-BQ |
| | § | |
| TEXAS TECH UNIVERSITY HEALTH | § | |
| SCIENCES CENTER (TTUHSC), *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS, CONCLUSIONS, AND
## RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendants Texas Tech University Health Sciences Center (TTUHSC),

Barbara Cherry, and Michael Evans's (Defendants) Motion to Dismiss and brief in support.  ECF

Nos. 11, 12.  Pro se Plaintiff Amy Pickett filed her response (ECF No. 13), and Defendants have

filed a reply.  ECF No. 15.  The motion is now ripe for decision.  After review of the motion and

applicable law, the undersigned recommends that the United States District Judge **GRANT in part**

and **DENY in part** Defendants' Motion to Dismiss.

### I.     Background

The Court accepts as true the following narrative from Pickett's Complaint.  In 2016,

TTUHSC admitted Pickett into its Doctor of Nursing Practice (DNP) program.  Compl. 3 ¶ 14,

ECF No. 1.  Pickett initially excelled academically in the DNP program, and in 2017 she decided

to simultaneously "pursue a separate post-master's certificate as a Family Nurse Practitioner"

(FNP).  *Id.* at 4 ¶ 16.  TTUHSC accepted Picket into the FNP program as well.  *Id.*  The DNP and

FNP programs "are separate and distinct programs," with "differing coursework and academic

requirements." *Id.* ¶ 17. Pickett was "scheduled to graduate from the DNP program in May 2019" and "the FNP program in August 2019." *Id.* ¶ 16.

Pickett suffers limitations due to attention deficit hyperactivity disorder (ADHD), for which she requested accommodation.[1] *Id.* ¶ 18. In May 2017, TTUHSC issued a Letter of Accommodation (LOA) granting her the following accommodations: (1) extended time on tests; (2) a quiet test environment; and (3) note-taking assistance in the form of professors providing copies of their PowerPoint presentations or lecture notes.[2] *See id.* at 4–5 ¶¶ 18–21. Pickett asserts that during the Fall 2017 semester she "did not experience any difficulty receiving the accommodations to which [she] was entitled when [she] requested them."[3] *Id.* at 5 ¶ 22. She maintained a 4.0 GPA and performed similarly during the Spring 2018 semester. *Id.*

During the Summer 2018 semester, however, Pickett "encountered negative reactions and hostility" when she presented the LOA to her professors. *Id.* ¶ 24. According to Pickett, her DNP professors "suddenly graded more harshly . . . and under different standards than those applied to other students." *Id.* at 6 ¶ 28. Dr. Jeanette Crenshaw, Pickett's DNP advisor, "insist[ed] that [Pickett] provide her with all assignments for [Crenshaw] to review a week before they were normally due to be graded." *Id.* ¶ 27. Pickett "disclosed [her] disability and need for accommodation" in the form of extra time, but Dr. Crenshaw "refused to work with [Pickett] or adjust the requested deadlines to accommodate [Pickett]." *Id.* ¶¶ 27–28.

---

[1] Elsewhere in her Complaint, Pickett avers that she suffers from anxiety, which she contends is also a qualifying disability. *See* Compl. 14 ¶ 73. Pickett does not allege, however, that she requested accommodation for any limitations due to anxiety. *See id.* at 3–13.

[2] Pickett's Complaint indicates that she had to request, receive, and present an LOA each semester. *See, e.g.*, Compl. 4 ¶ 18, 4–5 ¶ 20, 5 ¶ 23. Pickett apparently received a new LOA each semester she was enrolled, but she does not allege that the accommodations differed. *See id.* at 4–13.

[3] Although not entirely clear, Pickett appears to claim that prior to the Summer 2018 semester, she only requested accommodations in her FNP courses. *See* Compl. 5 ¶¶ 21–24.

That summer Pickett also "underwent surgery for a medical issue" and took leave.[4] *Id.* ¶ 29. While on leave, "TTUHSC accus[ed] [her] of falsifying [her] clinical hours" for course 7311 and recommended "that [she] be dismissed from the DNP program." *Id.* at 6–7 ¶ 30. Following a hearing where she presented evidence concerning her completion of the hours, however, TTUHSC did not dismiss Pickett from the program. *Id.* at 7 ¶ 32. Pickett also "took an incomplete in [her] second course, course 6201, as an accommodation for [her] medical condition," which "moved [the] due date for [her] primary paper to sometime in September 2018." *Id.* ¶ 33. Pickett submitted the paper for course 6201 "approximately 30 hours late." *Id.* ¶ 34. "The syllabus for 6201 provided that a student submitting a paper a day late would have one letter grade deducted from their grade." *Id.* According to Pickett, however, Cindy Acton, the professor for course 6201, assigned her a zero due to the paper being late, which "resulted in [Pickett] failing the course." *Id.* ¶ 35.

Pickett appealed the failing grade, and Professor Acton re-graded the assignment and again assigned a zero, this time citing Pickett's failure to incorporate feedback from Dr. Barbara Cherry and Dr. Crenshaw, respectively Pickett's advisor and the course facilitator. *Id.* at 8 ¶ 37. Pickett alleges the requirement to incorporate feedback was not applied to other students. *Id.* Pickett again appealed the grade. *Id.* ¶ 38. Pickett asserts that TTUHSC's policy provides for a "second faculty member, who was not the course facilitator, to blind grade the paper," but "Dr. Crenshaw, the course facilitator, graded the paper herself." *Id.* ¶¶ 38–39. Dr. Crenshaw assigned the paper a score of 59. *Id.* ¶ 39. TTUHSC then averaged the two grades—zero and 59—and Pickett received a final grade of 29.5 on the paper. *Id.* ¶ 40. Pickett contends that by averaging the two grades, she

---

[4] Pickett does not allege that this medical issue constitutes a qualifying disability. *See* Compl. 6–7, 14.

"was negatively impacted by the hostility of the first professor." *Id.* Ultimately, Pickett received a C in course 6201, "a grade for which the DNP program awarded no credit." *Id.* at 9 ¶ 42.

During the Fall 2018 semester, Pickett "again requested and timely provided [her] LOA to [her] professors" and "notified [them] that [she] was entitled to extended time, an alternate testing location and note-taking assistance." *Id.* ¶ 43. Pickett states that "Dr. Wendy Thal, the professor for one of [her] FNP courses, course 5440, acknowledged the LOA and stated [Pickett] would receive extended time" on tests. *Id.* ¶ 44. But "on October 2, 2018, when [Pickett] sat for a course 5440 examination that began at 9:00 a.m. . . . the extra time [she] had been granted pursuant to the LOA had not been allotted." *Id.* ¶ 45. Pickett immediately contacted several TTUHSC personnel in an attempt to remedy the testing issue. *Id.* ¶¶ 46–47. One of the course professors, Dr. Virginia Miller, initially responded that she would reset the test to begin at 10:00 a.m. *Id.* ¶ 48. Due to the "pressure and stress caused by the testing issue . . . and related ADHD symptoms," however, Pickett asked Ms. Karen Ganus, the Director of the Office of Student Services, to further delay the beginning of the test so that Pickett could "calm down." *Id.* at 9–10 ¶ 48. TTUHSC granted Pickett's request for an additional delay; the examination began at 10:30 a.m. and Pickett did not request further accommodation related to the exam's start time. *Id.* at 10 ¶¶ 49–50. Although TTUHSC restarted the test with the appropriate length of time in which to take the exam, Pickett contends that the "initial failure to provide [her] with the reasonable accommodations that [she] had been granted . . . caused [her] to receive a 62% on the first exam for course 5440." *Id.* ¶ 51.

Pickett sought permission to retake the first exam and also asked that she "be permitted an extra opportunity to replace [the] first exam grade with [the] comprehensive exam grade." *Id.* ¶¶ 52–53. TTUHSC denied both requests. *Id.* Pickett alleges that she suffered migraines during the second examination, and panic attacks during the third and comprehensive examinations,

resulting in poor grades. *Id.* at 10–11 ¶¶ 54, 56. TTUHSC similarly denied Pickett's request for "another testing opportunity." *Id.* at 11 ¶ 56.

Pickett also asserts that "despite having submitted the LOAs to [her] professors and despite [her] repeated requests, there were numerous instances where professors failed to provide [her] with the copies of lecture notes and power points [sic] as required by [her] LOA," including during the Fall semester 2018. *Id.* at 6 ¶ 26, 10–11 ¶ 55. Pickett alleges that "TTUHSC's repeated failures to accommodate [her]" caused her ADHD symptoms "to escalate throughout the fall 2018 semester," resulting "in poor grades that are nowhere near an accurate reflection of [her] knowledge and skill, as evidenced by [her] prior 4.0 GPA." *Id.* at 11 ¶ 56.

On December 18, 2018, Dean Michael Evans sent Pickett a letter stating that "following a review of grades by the DNP Council, [TTUHSC was . . . dismiss[ing] [Pickett] from the School of Nursing DNP Program." *Id.* ¶ 57. The letter provided, in part:

> Dismissal from TTUHSC School of Nursing PM-DNP Program will result from the following circumstances:
> - Students earning a "C" or lower in two or more DNP courses in one semester
> - Students earning a "C" or lower in the same DNP course twice
> - Students earning a "C" or lower in a second DNP course even though one DNP course has been retaken and a satisfactory grade of "B" or better has been obtained
> - Cumulative semester or cumulative GPA less than 2.0 for two consecutive semesters

*Id.* ¶ 58. The letter further stated that TTUHSC was dismissing Pickett based on "one or more of the stated standards" (*id.*), but Pickett avers that she did not meet any of the foregoing criteria. *Id.* at 12 ¶ 60. She concedes she "received a C in one DNP course, course 6210 [sic]," but the "other lower grade was in an FNP course, course 5440, in a different program, and, furthermore, in a different semester." *Id.*

Pickett timely appealed her academic dismissal. *Id.* ¶ 63. In January 2019, while her

appeal was pending, TTUHSC cut off Pickett's email access "and cancelled all of [her] DNP advising appointments." *Id.* ¶ 65. "Dr. Barbara Cherry, the Department Chair, then gave [Pickett] an ultimatum: [she] could remain in either the DNP Program or the FNP Program, but not both." *Id.* ¶ 66. Pickett "emailed Dr. Cherry requesting additional time to consider the ultimatum," but as she was sending the email, Pickett "simultaneously received an email from Dr. Cherry stating that, because she had not heard from [Pickett], TTUHSC's dismissal . . . would stand."[5] *See id.* at 12–13 ¶¶ 67–68.

On September 23, 2020, Pickett filed her original Complaint alleging claims under Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (RA), and procedural and substantive due process violations under 42 U.S.C. § 1983. ECF No. 1. Although not specifically pleaded, Pickett appears to raise both a claim for failure to accommodate and for disability discrimination under the ADA and RA against TTUHSC and Defendants Cherry and Evans in their official capacities. *See id.* at 5–11 ¶¶ 24–28, 34–56, 13. Further, Pickett alleges procedural and substantive due process violations against Defendants Cherry and Evans in their individual and official capacities. *Id.* at 16, 18. Pickett seeks injunctive relief in the form of "immediate re-enrollment in TTUHSC's DNP and FNP programs," as well as monetary damages and declaratory relief. *Id.* at 16 ¶¶ 77–78, 18 ¶¶ 93–94, 21 ¶¶ 112–13.

Defendants filed the pending Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). ECF No. 11. Defendants argue that Pickett's ADA and RA claims fail to demonstrate that TTUHSC or Defendants Cherry and Evans "fell short of their obligations to offer a reasonable accommodation for a disability upon request or engaged in disability discrimination." Defs.' Br.

---

[5] The timing of Pickett's email to Dr. Cherry requesting additional time, to the extent she sent one, and Dr. Cherry's email stating the dismissal would stand, is not clear. Compl. 12–13 ¶¶ 67–68.

1, ECF No. 12. Defendants also aver that, to the extent Pickett asserts Defendants harassed her based on her disability, the Fifth Circuit does not recognize a disability harassment claim and it must be dismissed. *Id.* at 12.

As to Pickett's procedural due process claim, Defendants posit that in the case of academic dismissal from an institution, the Constitution requires only minimum procedures of notice. *Id.* at 13. Defendants claim because Pickett concedes "she was notified of her dismissal [from TTUHSC], she appealed the dismissal, and then was given a path to continue in the program," she cannot state a procedural due process claim. *Id.* Pickett's substantive due process claim likewise fails, Defendants contend, because the purported actions of Defendants Cherry and Evans were within the realm of accepted academic norms. *Id.* at 14–15.

Moreover, Defendants Cherry and Evans raise the affirmative defense of qualified immunity as to Pickett's due process claims, which they assert Pickett cannot overcome because she "has not demonstrated that they violated any of her clearly established rights." *Id.* at 15–16. Finally, Defendants aver that "sovereign immunity bars Pickett's ADA claim and constitutional claims against TTUHSC and the official capacity defendants." *Id.* at 1. Defendants also contend that sovereign immunity bars Pickett's § 1983 claims for monetary relief against Defendants Cherry and Evans in their official capacities and, to the extent Pickett sues Defendants Cherry and Evans in their official capacities under the ADA and RA, her claims amount to a suit against TTUHSC and should therefore be dismissed as duplicative. *Id.* at 18–19. In support of their motion, Defendants filed four exhibits, consisting of an academic catalog, a student handbook, Pickett's "Application for Services," and a course syllabus. *See* ECF Nos. 12-1, 12-2, 12-3, 12-4.

Pickett's response is notably devoid of legal or factual argument. *See* Pl.'s Resp. 1–4, ECF No. 13. She reiterates that she has filed the Complaint in the correct jurisdiction and recites the

applicable ADA and RA statutes. *Id.* at 2–3. Pickett also generally claims that Defendants discriminated against her and denied her accommodations "related to a qualified, and documented disability." *Id.* at 1–2. Pickett attaches several exhibits in support. ECF Nos. 13-1, 14 (two LOAs, a grade sheet, and Defendant Evans's letter dismissing her from TTUHSC).

In reply, Defendants maintain that Pickett's failure to address their arguments necessitates dismissal. *See* Defs.' Reply 1–3, ECF No. 15. They also assert that "Pickett's factual allegations demonstrate that TTUHSC provided her with reasonable accommodations," as supported by decisions from courts presented with similar fact patterns. *Id.* at 2. In addition, Defendants allege that the Court does not have jurisdiction over Pickett's ADA claim because she has failed to plead facts demonstrating a violation of Title II or the Fourteenth Amendment. *Id.* at 4.

## II.    **Legal Standards**

### A. **Motion to Dismiss under Rule 12(b)(1)**

Rule 12(b)(1) authorizes a party to seek dismissal due to a lack of subject-matter jurisdiction. "Dismissal under Rule 12(b)(1) is appropriate if a claim is barred by state sovereign or Eleventh Amendment immunity." *Shaikh v. Tex. A&M Coll. of Med.*, 739 F. App'x 215, 217 (5th Cir. 2018) (per curiam) (citations omitted). The party asserting jurisdiction bears the burden of demonstrating its existence. *Id.* (citation omitted). "A court may dismiss under Rule 12(b)(1) on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 217–18 (citation and internal quotation marks omitted). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* at 218 (citation omitted).

## B. Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering 12(b)(6) motions, courts must accept well-pleaded facts (not mere conclusory allegations) as true and view them in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 555 (explaining that a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678) (stating that courts accept all well-pleaded facts as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility"). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## C. Qualified Immunity

"Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted). When a public official raises the affirmative defense of qualified immunity, the

court must conduct a two-step analysis to determine whether: (1) the plaintiff has demonstrated an official's conduct violated a constitutional or statutory right; and (2) the right was "clearly established" at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court may address these prongs in the order it deems appropriate, in light of the circumstances particular to the case. *Id.* at 236; *see Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009) (noting that the "rigid 'order of battle'—requiring courts to always address the constitutional issue of whether alleged conduct violated the constitution—is now advisory under *Pearson*"). A plaintiff bears the burden of negating a properly asserted qualified immunity defense. *Brumfield*, 551 F.3d at 326. When a defendant raises qualified immunity in a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (per curiam).

Courts liberally construe a pro se plaintiff's pleadings (*Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) and "hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints." *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam). "Even a liberally construed *pro se* . . . complaint, however, must set forth facts giving rise to a claim on which relief may be granted." *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) (per curiam) (citation omitted). If the court determines that a pro se plaintiff has pleaded her best case, the court does not err in dismissing the complaint with prejudice. *Jones v. Greninger*, 188 F.3d 322, 326–27 (5th Cir. 1999) (per curiam) (citation omitted).

### III.   Discussion

**A. The undersigned has not considered materials attached to the parties' motion and response.**

Prior to analyzing the substantive arguments in Defendants' Motion, the Court must address whether it may properly consider the attachments to Defendants' Motion to Dismiss and Pickett's response. When considering a Rule 12(b)(6) motion, "a district court must [typically] limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The Fifth Circuit, however, "has recognized one limited exception." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). A court may consider "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Id.* (citation omitted).

The Fifth Circuit has not described an exact test for determining when a document is central to a plaintiff's claims, but "case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). Where a document "is merely evidence of an element of the plaintiff's claim," however, "the court may not incorporate it into the complaint." *Id.* (citing *Scanlan*, 343 F.3d at 536–37). Regardless, "when matters outside the pleading are presented with a motion to dismiss under Rule 12(b)(6), a district court has complete discretion to either accept or exclude the evidence." *Gen Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007) (citation and internal quotation marks omitted).

Defendants attached four documents to their Motion to Dismiss: (1) TTUHSC School of Nursing Academic Catalog for the 2017–18 school year (Exhibit A) (ECF No. 12-1); (2) TTUHSC School of Nursing Student Handbook for the 2017–18 school year (Exhibit B) (ECF No. 12-2); (3) Pickett's "Application for Services," which she submitted for the 2017 year, requesting

accommodation (Exhibit C) (ECF No. 12-3); and (4) Course 6201 Summer 2018 Syllabus (Exhibit

D). ECF No. 12-4. In conclusory fashion, Defendants aver that the attachments "are central to

Pickett's allegations and referenced by the complaint."[6] *See, e.g.*, Defs.' Br. 2 n.1 & n.7, 3 n.14.

Pickett does not challenge consideration of the documents. *See* Pl.'s Resp. 1–4. Instead, Pickett

submitted several attachments of her own, including: (1) LOA for Summer 2018 semester;

(2) LOA for Fall 2018 semester; (3) grade sheet; and (4) Defendant Evans's letter dismissing her

from TTUHSC. *See* ECF No. 14.

Defendants' attachments are not central to Pickett's claims because they are "not necessary

to establish an element of any of [her] claims but [are] merely" evidence in support of her

allegations. *Kaye*, 453 B.R. at 662. For example, Exhibit A contains the standards for dismissal

from the DNP program. *See* ECF No. 12-1, at 12. Similarly, Exhibit B contains TTUHSC's

policies concerning academic grade challenges and appeal of final grades. *See* ECF No. 12-2, at

17–20. TTUHSC's written policies, however, do not inform the Court's ultimate evaluation of

whether TTUHSC violated Pickett's due process rights under the facts alleged. That is, whether

TTUHSC's *written policies*, in a vacuum, meet constitutional due process standards is not at issue

in this case; instead, Pickett challenges TTUHSC's *actual conduct* in dismissing her from the

---

[6] Defendants also ask "the Court to take judicial notice of Exhibits A & B." Defs.' Br. 2 n.1. Rule 201 of the Federal
Rules of Evidence permits courts to take judicial notice of "a fact that is not subject to reasonable dispute because it:
(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined
from sources whose accuracy cannot be questioned." Defendants do not identify the specific "facts" listed in the
exhibits that they want the Court to take notice of, nor do the specify the purpose for doing so. For this reason alone,
judicial notice is inappropriate. *See, e.g.*, *Adonai Commc'ns, Ltd. v. Awstin Invs., LLC*, Civil Action No. 3:10–CV–
2642–L, 2011 WL 4760409, at *1 (N.D. Tex. Oct. 7, 2011) (declining to take judicial notice, explaining that even if
plaintiff could have met Rule 201's requirements, it failed to "identif[y] the specific facts, documents, filings, motions,
pleadings, or orders it wishes the court to take judicial notice of, or the specific purpose for doing so"). Moreover,
"the court should only take judicial notice of facts sparingly at the pleadings stage." *Kaye*, 453 B.R. at 664 (internal
quotation marks and citation omitted). "Thus, [o]nly in the clearest cases should a district court reach outside the
pleadings for facts necessary to resolve a case at that point." *Id.* (internal quotation marks and citation omitted). For
these reasons, the Court declines to take notice of the academic catalog and handbook.

program—i.e., whether TTUHSC's actions in dismissing Pickett, whatever processes or procedures were utilized, afforded her sufficient due process and preserved her substantive fundamental rights. Similarly, Defendants' exhibits are not central to Pickett's ADA and RA claims because they do not address Defendants' purported motive in grading or dismissing Pickett—the only element Defendants challenge in their Motion to Dismiss. *See* Defs.' Br. 8–10. As a result, the undersigned has not considered the documents in evaluating Defendants' motion.[7]

## B. Pickett has plausibly stated certain claims under the RA—others are subject to dismissal.

The Fifth Circuit has held that a state's receipt of federal funds waives its sovereign immunity as to discrimination claims arising under Section 504 of the RA. *See Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 345 (5th Cir. 2005). Defendants do not dispute that TTUHSC has waived its sovereign immunity under the RA by accepting federal funding. *See* Br. 17. The Court must therefore evaluate dismissal of Pickett's RA claims under Rule 12(b)(6).

The Fifth Circuit has recognized that "[j]urisprudence interpreting either [the ADA or RA] is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). This is because "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

"A claim for failure to accommodate under the ADA [or RA] has the following elements: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered institution; and (3) the covered institution failed to make

---

[7] For the same reasons, the Court has not considered Pickett's attachments.

reasonable accommodations for such known limitations."[8] *Choi v. Univ. of Tex. Health Scis. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015) (per curiam). In relation to the discrimination claim, to establish a prima facie case for exclusion from an educational program under either the ADA or RA, a plaintiff must demonstrate that she was: "(1) an individual with a disability; (2) otherwise qualified for the program; and (3) excluded from, denied the benefits of, or otherwise subjected to discrimination under the program" on the basis of her disability. *Shaikh*, 739 F. App'x at 219 (citation and internal quotation marks omitted); *see Maples v. Univ. of Tex. Med. Branch at Galveston*, 901 F. Supp. 2d 874, 879 & n.3 (S.D. Tex. 2012), *aff'd*, 524 F. App'x 93 (5th Cir. 2013). The ADA and RA differ with respect to establishing the third element. Under the ADA, a plaintiff must show that her disability was a motivating factor in the exclusion. *Pinkerton v. Spellings*, 529 F.3d 513, 516–19 (5th Cir. 2008) (per curiam). In contrast, the RA requires a plaintiff to allege that she was discriminated against *solely* on the basis of her disability. 29 U.S.C. § 794(a).

Defendants focus their argument on the third element of each claim (failure to accommodate and discrimination), i.e., whether TTUHSC (1) failed to reasonably accommodate Pickett's known limitation and (2) excluded Pickett from the programs due to her disability, i.e., causation. *See* Defs.' Br. 8–10. The Court therefore similarly limits its examination to these two questions.

---

[8] Although Title II and the RA do not codify an express failure-to-accommodate theory, the Fifth Circuit has adopted the standard used in Title I cases. *See Windham v. Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017) (explaining that Fifth Circuit case law "recognize[s] that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II" and citing cases in support); *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 380 (5th Cir. 2016) (explaining that in evaluating an RA claim, "[d]iscrimination includes a failure to make reasonable accommodations"); *Aragona v. Berry*, Civil Action No. 3:10–CV–1610–G, 2012 WL 467069, at *10 (N.D. Tex. Feb. 14, 2012) ("Under both Title II and the RA, discrimination by a public entity includes failing to make reasonable modifications or accommodations to the disabled individual, so that (s)he can participate in the programs or activities provided by the public entity.").

*1. Failure to Accommodate.*

Pickett makes several allegations concerning TTUHSC's purported failure to accommodate. First, Pickett contends that Dr. Crenshaw did not accommodate her after Crenshaw "insist[ed] that [Pickett] provide . . . all assignments for [Crenshaw] to review a week before they were normally due to be graded." Compl. 6 ¶ 27. Pickett "disclosed [her] disability and need for accommodation" in the form of extra time, but Dr. Crenshaw "refused to work with [Pickett] or adjust the requested deadlines to accommodate [Pickett]." *Id.* ¶¶ 27–28.

Pickett also states that in Fall 2018, Dr. Thal, professor for "course 5440, acknowledged the LOA and stated [Pickett] would receive extended time" on tests. *Id.* at 9 ¶ 44. But according to Pickett, "on October 2, 2018, when [she] sat for a course 5440 examination . . . the extra time [she] had been granted pursuant to the LOA had not been allotted." *Id.* ¶ 45. Pickett contacted several TTUHSC personnel in an attempt to remedy the testing issue. *Id.* ¶¶ 46–47. One of the course professors, Dr. Miller, initially responded that she would reset the test to begin at 10:00 a.m. *Id.* ¶ 48. Due to the "pressure and stress caused by the testing issue . . . and related ADHD symptoms," however, Pickett asked Ms. Karen Ganus, the Director of the Office of Student Services, to further delay the beginning of the test so that Pickett could "calm down." *Id.* at 9–10 ¶ 48. TTUHSC granted Pickett's request for an additional delay; the examination began at 10:30 a.m. and Pickett did not request further accommodation related to the examination's start time. *Id.* at 10 ¶¶ 49–50. Although TTUHSC restarted the test later the same day with the appropriate time, Pickett contends that the "initial failure to provide [her] with the reasonable accommodations that [she] had been granted . . . caused [her] to receive a 62% on the first exam for course 5440." *Id.* ¶ 51.

15

Pickett asked to retake the first exam and also sought "an extra opportunity to replace [the] first exam grade with [the] comprehensive exam grade." *Id.* ¶¶ 52–53. TTUHSC denied both requests. *Id.* Pickett alleges that she suffered migraines during the second examination, and panic attacks during the third and comprehensive examinations, resulting in poor grades. *Id.* at 10–11 ¶¶ 54, 56. TTUHSC similarly denied Pickett's request for "another testing opportunity." *Id.* at 11 ¶ 56.

Further, Pickett asserts that "despite having submitted the LOAs to [her] professors and despite [her] repeated requests, there were numerous instances where professors failed to provide [her] with the copies of lecture notes and power points [sic] as required by [her] LOA," including during the Fall semester 2018. *Id.* at 6 ¶ 26, 10–11 ¶ 55. Pickett attributes her poor grades to, inter alia, "TTUHSC's repeated failures to accommodate [her]." *Id.* at 11 ¶ 56.

In Defendants' view, the "Complaint demonstrates that [Pickett] was given the reasonable accommodations she requested." Defs.' Br. 8. Defendants aver that "Pickett fails to identify what additional accommodations she needed or how the accommodations afforded to her were not reasonable." *Id.* at 10.

Regarding her October 2, 2018, examination, Pickett acknowledges that TTUHSC provided the accommodations she requested. *See* Compl. 9–10 ¶¶ 48–49. That is, TTUHSC delayed restarting the examination, as desired by Pickett, and provided an extended examination period in accordance with Pickett's LOA. *Id.* ¶¶ 48–50. Pickett states that she "was not ready to begin the exam [at 10:30 a.m.] but felt that [she] could not ask for another postponement . . . ." *Id.* at 10 ¶ 50. But TTUHSC cannot be liable for failing to provide accommodations Pickett did not request. *See, e.g., Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir. 2007) (citation omitted) (providing that "[i]t is the plaintiff's burden to request reasonable accommodations");

16

*Pegues v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, CIVIL ACTION NO. 18-2407, 2019 WL 1544366, at \*7 (E.D. La. Apr. 9, 2019) ("[B]ecause Plaintiff declined accommodations in November 2015, LSU cannot be liable for not providing accommodations at that time.").

Moreover, Pickett's claims concerning her requests to retake exams or substitute exam grades in course 5440 are without merit. *See* Compl. 10–11 ¶¶ 52–54, 56. As discussed above, Pickett did not request further accommodation before taking the first exam. *Id.* at 10 ¶ 50. Her after-the-fact request to substitute the grade is therefore unavailing. *See, e.g., Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 n.14 (5th Cir. 1997) (observing, in the context of a Title I case, that "a 'second chance' or a plea for grace is not an accommodation as contemplated by the ADA"). Further, Pickett has not pleaded facts demonstrating TTUHSC was required to accommodate her as to the second, third, and comprehensive exams. Pickett attributes her poor performance not to limitations caused by her disability, but to migraines and anxiety.[9] *See* Compl. 10–11 ¶¶ 53–54, 56. As such, she has not stated a claim. *See, e.g., Maples v. Univ. of Tex. Med. Branch at Galveston*, 524 F. App'x 93, 94–95 (5th Cir. 2013) (per curiam) (affirming district court's grant of summary judgment in favor of defendant on student's failure-to-accommodate claim, where student earned a low grade "under the requested test conditions while taking her ADHD medication" and there was no evidence that defendant's "refusal to grant [student's] request to complete additional, extra credit assignments was motivated by discrimination against her due to her ADHD"); *Shah v. Univ. of Tex. Sw. Med. Sch.*, 54 F. Supp. 3d 681, 705 (N.D. Tex. 2014) (granting defendant's motion to dismiss on student's failure-to-accommodate claim under the RA,

---

[9] As noted above, although Pickett alleges that anxiety is a qualifying disability, she does not claim to have requested accommodations for any limitations due to anxiety. *See* Compl. 3–13. As a result, Pickett cannot show that TTUHSC failed to provide a reasonable accommodation. *See Jenkins*, 487 F.3d at 315.

where his allegations reflected "that factors *other than* [student's] ADHD motivated the negative professionalism reviews that ultimately resulted in [student's] dismissal from" university).

Thus, the Court recommends that the district judge dismiss Pickett's failure-to-accommodate claims based on the start time of the October 2, 2018, examination, and Pickett's requests to retake exams or substitute exam grades in course 5440.

Regarding Pickett's allegations that (1) Dr. Crenshaw did not grant additional time to submit assignments for feedback, and (2) professors failed to provide lecture notes or copies of PowerPoint presentations in accordance with her LOA, however, the Court finds Pickett's contentions, accepted as true, at this juncture state a plausible claim for relief. Pickett avers that despite disclosing her disability and need for accommodation, Dr. Crenshaw refused to amend her requirement that Pickett submit assignments for Crenshaw's "review a week before they were normally due to be graded." Compl. 6 ¶¶ 27–28. Further, Pickett contends that she requested her professors honor the accommodations provided in the LOA, but TTUHSC failed to provide reasonable accommodation in the form of note-taking assistance.[10] *See id.* at 6 ¶ 26, 9 ¶ 43, 10–11 ¶¶ 55–56. Pickett alleges that "TTUHSC's repeated failures to accommodate [her disability]" caused her ADHD symptoms "to escalate throughout the fall 2018 semester," resulting "in poor

---

[10] Defendants observe that when she submitted her request for accommodation to TTUHSC's ADA office, Pickett only asked for additional test time. Defs.' Br. 9; *see* Compl. 4 ¶ 18 (explaining that she "filed paperwork with TTUHSC's ADA office" and her "request noted the impact of [her] ADHD on [her] ability to focus and complete academic tasks under time limited conditions such as testing"). For this reason, Defendants apparently do not address Pickett's contention that TTUHSC failed to provide note-taking assistance as required. *See generally* Defs.' Br. 9–10 (failing to discuss Pickett's allegation that she sought accommodation in the form of note-taking assistance). "[A] plaintiff need not request, or even know, the particular reasonable accommodation [s]he ultimately requires. That judgment is best determined through a flexible, interactive process involving both the plaintiff and the public entity." *Windham*, 875 F.3d at 237 n.11 (internal quotation marks and citation omitted). Moreover, Pickett alleges that she presented the applicable LOA to professors and requested the accommodations stated therein. *See* Compl. 9 ¶ 43, 10–11 ¶¶ 55–56. Thus, regardless of what accommodations Pickett may have initially sought, she specifically avers that she requested accommodation in the form of, inter alia, note-taking assistance, as provided in the LOA.

grades that are nowhere near an accurate reflection of [her] knowledge and skill, as evidenced by [her] prior 4.0 GPA." *Id.* at 11 ¶ 56.

At this stage, Pickett has alleged sufficient facts to state a plausible claim that TTUHSC failed to reasonably accommodate her disability when it: (1) failed to provide lecture notes; and (2) refused to amend review deadlines for assignments in the DNP program. *See Bennett-Nelson*, 431 F.3d at 455 ("If the accommodation is required the defendants are liable simply by denying it."); *Pegues*, 2019 WL 1544366, at *7 (finding plaintiff's allegation that she requested accommodation, including extra time of examinations, "but was told that extra time would not be 'necessary'" stated plausible claim for relief sufficient to survive motion to dismiss).

*2. Exclusion from a program by reason of disability.*

Defendants argue that "Pickett has not alleged facts that create the reasonable inference that TTUHSC treated her more adversely than other students because of [Pickett's] ADHD." Defs.' Br. 11. According to Defendants, Pickett's "poor performance was a legitimate, non-discriminatory basis for her academic dismissal." *Id.* at 8.

"An individual with a disability is excluded from, denied the benefits of, or otherwise subjected to discrimination under a program solely by reason of . . . [her] disability if: (1) there is a causal connection between [her] disability and the discriminatory action; and (2) [her] disability was the only cause of the discriminatory action." *Shaikh*, 739 F. App'x at 222 (internal quotation marks and citation omitted). "The causal connection between the individual's disability and the discriminatory action need not be direct in order to satisfy the sole reason requirement: it is sufficient that the disability caused the individual to do or not do something, which, in turn, caused the discriminatory action." *Id.* (internal quotation marks and citation omitted). To establish the "solely by reason of" requirement under the RA, however, "the disability must have been the *only*

cause of the . . . conduct that trigger[ed] the discriminatory action." *Id.* (internal quotation marks and citation omitted). That is, the plaintiff's disability must "be more than simply a motivating factor in the discriminatory action."[11] *Id.* (internal quotation marks and citation omitted).

Pickett alleges that TTUHSC "discriminated against [her] on the basis of [her] disability." Compl. 14 ¶ 75. In support, Pickett asserts the following:

- During the Summer 2018 semester, Pickett first presented her LOA to her DNP program advisor and professors. *Id.* at 5 ¶ 24.

- "TTUHSC accus[ed] [her] of falsifying [her] clinical hours" for course 7311 and recommended "that [she] be dismissed from the DNP program." *Id.* at 7 ¶ 30. After a hearing and presenting evidence concerning her completion of the hours, TTUHSC did not dismiss Pickett from the program. *Id.* ¶ 32.

- Pickett submitted her paper for course 6201 approximately thirty hours late. *Id.* ¶ 34. Dr. Acton, professor for course 6201, improperly graded her paper by assigning a zero in violation of "the syllabus and the policies [that] applied to all other students for late submissions, . . . without any justification other than [Pickett] had required additional time due to [her] medical conditions." *Id.* ¶ 35. Pickett appealed the failing grade, and Professor Acton re-graded the assignment and again assigned a zero, this time citing Pickett's failure to incorporate feedback from Dr. Cherry and Dr. Crenshaw. *Id.* at 8 ¶ 37. Pickett alleges this requirement did not apply to other students. *Id.* After Pickett appealed Dr. Acton's re-grade, Dr. Crenshaw graded the paper, which Pickett believes was in contravention of TTUHSC policy. *Id.* ¶¶ 38–39. According to Pickett, she ultimately received a C in course 6201 due to the paper's grade. *Id.* at 9 ¶ 42.

- TTUHSC initially failed to provide her extra time on the first examination for course 5440 in the FNP program. *See id.* at 9–10 ¶¶ 44–51.

- TTUHSC dismissed Pickett from the DNP and FNP programs "despite the fact that [she] did not meet the stated criteria for dismissal." *Id.* at 15 ¶ 75.e. She concedes she "received a C in one DNP course, course 6210 [sic]," but the "other lower grade was in an FNP course, course 5440, in a different program, and, furthermore, in a different semester." *Id.* at 12 ¶ 60.

Pickett may establish her claim of disability discrimination through direct or circumstantial evidence. *See Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 762 (5th Cir. 1996).

---

[11] Under the ADA, however, a plaintiff must only demonstrate that her disability was a "motivating factor" in defendant's discrimination. *See, e.g., Maples*, 524 F. App'x at 95 (citation omitted).

The Court finds that Pickett's allegations are sufficient to state a claim that TTUHSC intentionally discriminated against her solely because of her disability. *See, e.g.*, *Shaikh*, 739 F. App'x at 223 (concluding student plausibly alleged his disability was the only cause of defendant's alleged actions, where student asserted that defendant required him to take a licensing examination during a leave of absence caused by his disability, forced him to withdraw from the program, and failed to readmit him due to his disability); *Pegues*, 2019 WL 1544366, at *8 (finding student's allegation survived motion to dismiss, where she claimed defendant: (i) required her to complete a quiz that other students without disabilities did not have to take; (ii) miscalculated her grade due to animosity because of her disability; and (iii) berated and accused her of making excuses when she requested accommodation). At this stage of the proceeding, such allegations, taken as true, are sufficient to survive a motion to dismiss directed at Pickett's RA discrimination claims.

Thus, the undersigned recommends that the district judge grant-in-part Defendants' Rule 12(b)(6) Motion with respect to Pickett's RA claim for failure-to-accommodate based on the start time of the October 2, 2018, examination, and Pickett's requests to retake exams or substitute exam grades in course 5440. The undersigned further recommends that the district judge deny Defendants' Motion as to Pickett's remaining RA claims, i.e., those for failure-to-accommodate based on Dr. Crenshaw's denial of additional time to submit assignments for feedback and her professors' failure to provide lecture notes, as well as Pickett's disability discrimination allegations.

### C. Title II of the ADA

Title II's waiver of sovereign immunity stands on different footing than that of the RA. The RA's sovereign immunity "waiver . . . does not apply to Title II because the ADA does not condition the receipt of federal funds on compliance with the [ADA] or waiver of Eleventh

Amendment immunity." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 276 n.4 (5th Cir. 2005). "Rather, Title II applies to public entities regardless of whether they receive federal funds." *Id.* Thus, the Court must first determine whether Congress has abrogated Texas's (and thereby TTUHSC's) sovereign immunity with respect to Pickett's ADA claim.

"Congress can abrogate [a state's sovereign] immunity if it (1) 'makes its intention to abrogate unmistakably clear in the language of the statute' and (2) 'acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 617 (5th Cir. 2020) (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)). "Congress [has] expressly declared that states 'shall not be immune' from suit for a violation of the ADA." *Id.* (quoting 42 U.S.C. § 12202); *see Shaikh*, 739 F. App'x at 224. Thus, the Court turns to the second inquiry, which "is more complicated." *Block*, 952 F.3d at 617.

Under this analysis, courts conduct a three-part test as set forth in *United States v. Georgia* "[t]o determine whether Title II of the ADA is a valid exercise of Congress's authority under § 5 of the Fourteenth Amendment." *Shaikh*, 739 F. App'x at 224; *see Block*, 952 F.3d at 617. If the state's alleged conduct violated (1) Title II and (2) the Fourteenth Amendment, Title II constitutes a valid waiver of state sovereign immunity. *See Block*, 952 F.3d at 617 (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)). Absent an independent Fourteenth Amendment violation, however, a court must proceed to the third criterion and determine whether Congress's abrogation of sovereign immunity is "nevertheless valid" as to the class of conduct that violated only the ADA (element one). *Id.* at 617 & n.11 (quoting *Georgia*, 546 U.S. at 159). The three-step analysis set forth in *Georgia* must be considered "on a 'claim-by-claim basis.'" *Id.* (quoting *Georgia*, 546 U.S. at 159).

### 1. Pickett has sufficiently pleaded facts demonstrating TTUHSC violated Title II of the ADA.

Pickett bases her failure-to-accommodate and disability discrimination ADA claims on the same conduct giving rise to her RA claims. *See* Compl. 13–16. "So far as this case is concerned, the only material difference between Title II and Section 504 is that Title II contains a less demanding causation standard." *Shaikh*, 739 F. App'x at 224 (citation omitted). "Because [Pickett] has stated a claim under Section 504" for disability discrimination and the failure-to-accommodate through Dr. Crenshaw's denial of additional time to submit assignments for feedback and her professors' failure to provide lecture notes, the undersigned "conclude[s], for purposes of *Georgia*'s abrogation analysis, that the same conduct is a violation of Title II of the ADA." *Id.*

### 2. Pickett has not sufficiently demonstrated that Defendants' alleged Title II violations also breach the Fourteenth Amendment.

Under *Georgia*'s second prong, the Court must evaluate the extent to which the entity's alleged unlawful Title II conduct also violated the Fourteenth Amendment. 546 U.S. at 159. "Section Five of the Fourteenth Amendment provides that 'Congress shall have power to enforce, by appropriate legislation, the provisions' of the Fourteenth Amendment, including the Equal Protection Clause and the Due Process Clause." *Pegues*, 2019 WL 1544366, at *8 (quoting U.S. Const. amend XIV, § 5). Under Section 5, Congress may "create private remedies against the states for violations of the Fourteenth Amendment." *Id.* (citing *Georgia*, 546 U.S. at 158). Thus, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159.

Pickett asserts procedural and substantive due process claims.[12] Compl. 16, 18. Pickett contends that she had a "constitutionally protected property interest in [her] continued enrollment . . . [and] education . . . [through] TTUHSC's DNP and FNP programs." *Id.* at 16 ¶ 81, 18–19 ¶ 98. Pickett alleges TTUHSC (1) did not provide pre-dismissal notice that it found her academic performance lacking and (2) failed to "provide any notice at any point that [she] was being dismissed from the FNP program." *Id.* at 16–17 ¶ 83. In her view, TTUHSC also failed to timely consider Pickett's appeal regarding her academic dismissal prior to the decision being finalized. *See id.* at 17 ¶¶ 85–87, 20 ¶¶ 105–108. Finally, Pickett contends that the Court may "override" Defendants' decision to dismiss her for academic deficiencies because they "substantial[ly] depart[ed] from accepted academic norms" when "they did not actually exercise professional judgment." *Id.* at 19 ¶ 99.

It is debatable whether Pickett possesses either a substantive or procedural due process right in her continued enrollment in TTUHSC's programs. Concerning substantive due process, the Supreme Court has recognized that the Due Process Clause guarantees more than procedural fairness, covering "a substantive sphere as well, [and] barring certain government actions regardless of the fairness of the procedures used to implement them." *Shah*, 129 F. Supp. 3d at 502 (internal quotation marks omitted). Its "reach . . . is limited, however, and it protects against only the most serious of governmental wrongs." *Id.* (quoting *Moore v. Dall. Indep. Sch. Dist.*, 557 F. Supp. 2d 755, 761 (N.D. Tex. 2008)). The Supreme Court has further emphasized that "'because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended,'

---

[12] Pickett also references alleged retaliation in her Response. *See* Pl.'s Resp. 1. Pickett, however, raises only three causes of action her Complaint: ADA and RA violations, as well as procedural and substantive due process claims. *See* Compl. 13–18. The Court therefore does not consider any potential retaliation claim. Nor does Pickett contend TTUHSC's "conduct violated the Equal Protection Clause or any constitutional provision incorporated by the Fourteenth Amendment." *Shaikh*, 739 F. App'x at 225 n.10.

courts should be 'reluctant to expand the concept of substantive due process.'" *Frasier v. Fox*, No. A-06-CA-768-SS, 2007 WL 2572040, at *5 (W.D. Tex. Sept. 5, 2007) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)), *aff'd*, No. 08-50072, 2008 WL 4949042 (5th Cir. Nov. 20, 2008).

"The law regarding substantive due process rights in the context of higher education . . . is far from settled." *Shah*, 54 F. Supp. 3d at 696. As noted by Judge Fitzwater in *Shah*, "[t]he Supreme Court has twice avoided deciding whether students at a public university have a substantive due process right to continued education, assuming arguendo that such a right exists and concluding that no substantive due process rights were violated by the conduct alleged." *Id.* (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 223–25 (1985) and *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91–92 (1978)). Lower courts have followed suit, simply assuming the existence of the right and then examining the challenged conduct under *Ewing*'s deferential "professional judgment" standard.[13] *See, e.g.*, *Wije v. Tex. Woman's Univ.*, No. 4:14-CV-571-ALM-CAN, 2016 WL 11472335, at *13 (E.D. Tex. Feb. 5, 2016), *R. & R. adopted by* 2016 WL 1156514 (E.D. Tex. Mar. 24, 2016), *aff'd sub nom. Wije v. Stuart*, 694 F. App'x 234 (5th Cir. 2017) (following *Ewing*, the court assumed arguendo the existence of a substantive due process right to be free from arbitrary grading and found that university's professors exercised professional judgment in grading assignments); *Jackson v. Lee Coll.*, No. CIV.A. H-13-1104, 2015 WL 851926, at *3 (S.D. Tex. Feb. 26, 2015) (applying *Ewing*'s "professional judgment" test in finding no substantive due process violation where university modified graduation and testing

---

[13] In an academic setting, decisions "are subject to 'a narrow avenue for judicial review' under a substantive due process standard" (*Wheeler v. Miller*, 168 F.3d 241, 249 (5th Cir. 1999) (per curiam) (quoting *Ewing*, 474 U.S. at 227)), and judges "should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225. Courts "may not override [an academic decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* "[C]ourts that have addressed" students' substantive due process claims "have almost universally upheld the academic decisions of public universities." *Shah*, 54 F. Supp. 3d at 696–97 (compiling cases).

requirements); *Shah*, 54 F. Supp. 3d at 696 (applying *Ewing* and finding no substantive due process violation, even assuming the existence of such a right).

The question of whether TTUHSC's alleged conduct violates Pickett's procedural due process rights presents an equally unsettled question. The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, to state a viable procedural due process claim, Pickett must first demonstrate that she possesses a protected interest, i.e., a life, liberty, or property interest. *See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 569–71 (1972). Pickett maintains that she holds a "constitutionally protected property interest in [her] continued enrollment . . . [and] education . . . [through] TTUHSC's DNP and FNP programs."[14] Compl. 16 ¶ 81, 18–19 ¶ 98.

Protectable property interests derive not from the Constitution but from other independent sources, e.g., state law. *See Roth*, 408 U.S. at 577. The Court has not found, and Pickett has not cited, any cases standing for the proposition that Pickett possesses a protectable property interest in higher education. In the cases that have addressed a plaintiff's procedural due process claim based on continued enrollment in higher education following academic dismissal, courts have again assumed the existence of a liberty or property interest and then proceeded to find that the process afforded was constitutionally adequate.[15] *See, e.g., Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978) (assuming existence of a liberty or property interest in higher education and concluding medical student was "awarded at least as much due process as the

---

[14] Pickett also alleges that TTUHSC did not timely consider her appeal. Compl. 12 ¶ 63. Pickett, however, is not constitutionally entitled to an appeal process. *See Wren v. Midwestern State Univ.*, Civil Action No. 7:18-cv-00060-O-BP, 2019 WL 3099408, at *14 (N.D. Tex. June 25, 2019); *Shah*, 54 F. Supp. 3d at 692. Moreover, to the extent Pickett asserts Defendants failed to comply with TTUHSC policies, she cannot state a viable due process claim. *See, e.g., Shah*, 54 F. Supp. 3d at 695 n.15 (citation omitted).

[15] United States District Judge Boyle observed as much in *Oliver v. University of Texas Southwestern Medical School*, wherein she analyzed a medical student's § 1983 due process claim based on his alleged improper *disciplinary* dismissal and considered whether he possessed a liberty interest in his continued enrollment in medical school. CIVIL ACTION NO. 3:18-CV-1549-B, 2019 WL 536376, at *7–8 (N.D. Tex. Feb. 11, 2019).

Fourteenth Amendment requires" before her academic dismissal); *Shaikh*, 739 F. App'x at 225 (assuming, without deciding, student possessed a property interest in higher education); *Davis v. Mann*, 882 F.2d 967, 97 (5th Cir. 1989) ("Like the Supreme Court in . . . *Horowitz*, we need not decide what type of interest [dental school resident] had in the [residency] program, because even assuming the existence of a liberty or property interest, [resident] received all the process he was entitled to under the Fourteenth Amendment . . . ." (internal quotation marks omitted)); *Shah*, 54 F. Supp. 3d at 694 (assuming, "as did the *Horowitz* Court, that [plaintiff student] has a protected property or liberty interest in continuing his medical school education at UT Southwestern"); *Doe v. Univ. of N. Tex. Health Sci. Ctr.*, No. 02-19-00321-CV, 2020 WL 1646750, at *4 (Tex. App.— Fort Worth Apr. 2, 2020, pet. denied) (explaining that because defendants agreed that student "ha[d] a protectible liberty or property interest sufficient to entitle him to due-course protection," such "concession pretermit[ted] the need for further discussion of what rises to the level of a protectible interest").

The Court has not found, and no party has cited, controlling authority that definitively answers the question of whether Pickett possesses a protected substantive or procedural due process right under the facts alleged herein. The Court need not resolve either of these important questions, however, to determine whether Title II has abrogated TTUHSC's sovereign immunity. Because examination of the third *Georgia* element nevertheless results in a waiver of ADA sovereign immunity, the Court need not resolve these questions and declines to recognize either right under the facts as alleged. The Court therefore proceeds to the third *Georgia* prong.[16]

---

[16] Assuming such controlling authority does exist and recognizes these rights, it would not change the undersigned's recommendation. If Pickett possesses a protected substantive or procedural due process right under the Fourteenth Amendment and TTUHSC's alleged conduct violated that right, then the second *Georgia* element is satisfied and sovereign immunity is waived. At that point consideration of *Georgia*'s third element would be unnecessary.

### 3. *Congress's abrogation of Texas's sovereign immunity is otherwise valid.*

To evaluate whether Congress's purported abrogation of Texas's sovereign immunity is a valid exercise of its enforcement power under § 5, the Court must consider an additional three-part analysis, this one described in *City of Boerne v. Flores*, 521 U.S. 507 (1997). *Boerne* directs courts to consider: (1) the nature or scope of the constitutional right Congress sought to protect in enacting Title II; (2) whether there is a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is a congruent and proportional response to the constitutional violations Congress sought to remedy. *See Tennessee v. Lane*, 541 U.S. 509, 520–22, 530 (2004) (describing the elements of the test established in *Boerne*); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 423–24 (5th Cir. 2004) (Garza, J., concurring in part) (discussing the *Boerne* elements); *Pace*, 403 F.3d at 277; *see also Block*, 952 F.3d at 617 (quoting *Boerne*, 521 U.S. at 520) ("Section 5 legislation that targets facially constitutional conduct is valid only if it demonstrates 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'").[17]

---

[17] There is a split among the circuits as to whether *Lane*'s analysis and holding conclusively establish the first two *Boerne* elements in cases implicating equal protection guarantees against irrational discrimination, thus requiring examination of only the third factor, i.e., congruent and proportional. *See Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012) (acknowledging split and compiling cases); *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006) (acknowledging split but applying entirety of *Boerne's* three part test because *Lane* only examined "particular rights at stake . . . in the context of judicial services," while the "history of discrimination and the need for prophylaxis will vary greatly in these different contexts"); *Arce v. Louisiana*, CIVIL ACTION No. 16-14003, 2017 WL 5619376, at *22 (E.D. La. Nov. 21, 2017) (noting "[s]ome circuits have read *Lane* to streamline the relevant analysis under *Boerne*'s first two prongs, leaving only the question whether Title II exhibits congruence and proportionality . . ."). Some courts have read Judge Garza's analysis in his *McCarthy* concurrence-in-part to stand for the proposition that the Fifth Circuit has held *Lane* conclusively establishes *Boerne*'s first two prongs, thus eliminating the need to analyze those factors. *Guttman*, 669 F.3d at 1117; *Arce*, 2017 WL 5619376, at *22. In his opinion, Judge Garza states that *Lane* "appears to have resolved [the] question" of whether Congress has identified a pattern of unconstitutional discrimination against disabled individuals—i.e., step two of the *Boerne* test. *McCarthy*, 381 F.3d at 423. In the undersigned's view it does not appear that Judge Garza expressly stated that *Lane* eliminates the need to analyze the first two prongs and, even if his opinion can be read as such, he did so within the context of a concurring opinion. *Id.* Because the Court has found no Fifth Circuit case specifically so holding, the undersigned analyzes all three prongs.

As to *Boerne*'s first element, Congress enacted Title II "to enforce [the] prohibition on irrational disability discrimination," as well as "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Lane*, 541 U.S. at 522–23. Here, the right at issue is an individual's right to be free from irrational disability discrimination in the context of higher public education. *See id.* at 522; *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 554 (3d Cir. 2007); *Assoc. for Disabled Ams., Inc. v. Fl. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005). "The Supreme Court's Equal Protection Clause and Due Process Clause jurisprudence places a special emphasis on the constitutional rights implicated by discrimination in public education, and Title II seeks to enforce those rights by prohibiting discrimination against the disabled and providing for accommodations of their special needs." *Toledo*, 454 F.3d at 36.

*Boerne*'s second prong requires the Court to consider whether there is a history of violations of the foregoing right by the states. *Boerne*, 521 U.S. at 532; *Lane*, 541 U.S. at 523. As Judge Garza suggests and other circuits have expressly held, *Lane* effectively settles this inquiry in the context of public education. *See McCarthy*, 381 F.3d at 423; *see, e.g., Constantine v. The Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) (examining disability claim by law student and holding that, "[a]fter *Lane*, it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services"). The Supreme Court explained that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. The Court specifically considered evidence of disability discrimination in the context of, inter alia, "public education." *Id.* at 525 (citing cases for support). The "sheer volume of evidence demonstrating the nature and extent of unconstitutional

29

discrimination against persons with disabilities in the provision of public services," the Court reasoned, supported the conclusion that Title II "was an appropriate subject for prophylactic legislation." *Id.* at 528–29.

Other recent decisions have reached a similar conclusion. The First Circuit in *Toledo* cited and discussed numerous cases demonstrating historical discrimination of students in public education. 454 F.3d at 37–39 (citing cases). Based on these cases, the First Circuit concluded that "the thirty years preceding the enactment of the ADA evidence a widespread pattern of states unconstitutionally excluding disabled children from public education and irrationally discriminating against disabled students within schools." *Id.* at 38–39. The Court finds this thorough survey of cases instructive and, like the *Toledo* court, concludes that "Congress was justified in enacting prophylactic § 5 legislation in response." *Id.* at 39; *see also Bowers*, 475 F.3d at 554 & n.35 (holding that *Lane* conclusively established the second *Boerne* prong—i.e., a documented history of disability discrimination—but also agreeing that "there had been a long and sad history of discrimination against students with learning disabilities prior to the adoption of Title II of the ADA," as documented extensively in United States' brief); *Ass'n for Disabled Ams.*, 405 F.3d at 958 (observing that the *Lane* Court "considered the record supporting Title II *as a whole,* and conclusively held that Congress had documented a sufficient historical predicate of unconstitutional disability discrimination in the provision of public services," including public education, such that Title II is a justified "prophylactic remedy pursuant to Congress's authority under Section 5 of the Fourteenth Amendment").[18]

---

[18] In *Guttman,* the Tenth Circuit refused to extend *Lane*'s historical disability discrimination finding to individuals seeking professional licensing, e.g., a doctor's medical license. 669 F.3d at 1119. The court did acknowledge, however, that "[s]everal circuits have found Title II validly abrogates state sovereign immunity" as to students' disability claims related to public education, given the "exceptionally well-documented history of irrational discrimination in schools," and noted that "[d]iscrimination against students in public education is an exception that proves the rule." *Id.* at 1123 n.4.

Thus, the only question then remaining is whether Title II is congruent and proportional in the context of cases implicating disability discrimination in public higher education.[18] *See generally Lane*, 541 U.S. at 530–31 (acknowledging that while Title II applies to a broad range of categories and may range from "public education and voting-booth access . . . to seating at state-owned hockey rinks . . . nothing in [Supreme Court] case law requires [the Court] to consider Title II, with its wide variety of applications, as an undifferentiated whole"). The undersigned concludes that proper construction of existing case law requires a finding that it is.

The Supreme Court has not precisely defined "what it means for legislation to be congruent and proportional." *Guttman*, 669 F.3d at 1121 (surveying cases). Nevertheless, in considering the question, several other circuit courts have focused on: "(1) the persistent pattern of exclusion and irrational treatment of disabled students in public education, (2) the gravity of the harm worked by such discrimination, and (3) the limited nature of the compliance costs imposed on states." *Guttman*, 669 F.3d at 1123 n.4 (citing cases for support). Specifically, as discussed above, "Title II addresses the fact that physical barriers historically perpetuated the exclusion of disabled students." *Toledo*, 454 F.3d at 39 (citing *Bd. of Trs. of Ala. v. Garrett*, 531 U.S. 356, 391 (2001) (Breyer, J., dissent)); *see Bowers*, 475 F.3d at 555 ("Congress enacted Title II against the backdrop of our regrettable national history in educating students with disabilities."). Although Title II imposes a greater burden on states than the Fourteenth Amendment, it "requires only 'reasonable modifications that would not fundamentally alter the nature of the service provided.'"

---

[18] Several district courts have distinguished between undergraduate and post-graduate education, finding that Title II does not validly abrogate a state's Eleventh Amendment immunity when the claim involves denial of access to post-graduate education. *See, e.g.*, *Saqr v. Univ. of Cincinnati*, Case No: 1:18-cv-542, 2019 WL 699347, at *6–9 (S.D. Ohio Feb. 20, 2019), *R. & R. adopted by* 2019 WL 1200802 (S.D. Ohio Mar. 14, 2019); *Doe v. Bd. of Trs. of Univ. of Ill.*, 429 F. Supp. 2d 930, 939 (N.D. Ill. 2006). The Supreme Court, however, has recognized the general importance of public education, though not as a fundamental right. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202–21 (1982). The limited number of court opinions distinguishing between undergraduate and post-graduate public education are not controlling, and the undersigned does not draw such a distinction herein.

*Ass'n for Disabled Ams.*, 405 F.3d at 959 (quoting *Lane*, 541 U.S. at 532); *see Toledo*, 454 F.3d at 39–40 ("[T]he ADA does not require public schools and universities to accommodate disabled students if the accommodation would substantially alter their programs or lower academic standards, and courts give due deference to the judgment of education officials on these matters."); *Constantine*, 411 F.3d at 489 ("Undoubtedly, Title II imposes a greater burden on the States than does the Fourteenth Amendment," but it "limit[s] the scope of liability in important respects and thus minimize[s] the costs of compliance with the statute."). Moreover, "[a] state may take into account its limited resources as well as the needs of other students with disabilities in determining what sorts of reasonable modifications are appropriate under Title II." *Toledo*, 454 F.3d at 39.

As reflected by the foregoing authority, the majority of circuit courts considering whether Title II is congruent and proportional in the context of higher public education (including the First, Third, Fourth, and Eleventh) have ultimately found that Congress validly abrogated immunity.[19] *See Bowers*, 475 F.3d at 556 (holding that state was not entitled to sovereign immunity in regard to high school student's ADA claim that, inter alia, the University of Iowa stopped recruiting him

---

[19] In a pre-*Lane* and *Georgia* case, the Sixth Circuit held that the state was entitled to sovereign immunity as to a graduate student's Title II claim that the university failed to accommodate his learning disability and dismissed him based on that disability. *Carten v. Kent State Univ.*, 282 F.3d 391, 393–95 (6th Cir. 2002). In so holding, the Sixth Circuit explained that it was bound by a prior en banc decision, *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas, Domestic Relations Div.*, 276 F.3d 808 (6th Cir. 2002), in which it concluded "that the Eleventh Amendment bars equal protection ADA Title II claims against state entities." *Id.* at 395. The Sixth Circuit's *Popovich* decision was based on the Supreme Court's reasoning in *Garrett* that Congress had not validly waived sovereign immunity for *Title I* claims because Congress had not demonstrated a pattern of constitutional violations regarding public employment. *Popovich*, 276 F.3d at 812 (citing *Garrett*, 531 U.S. at 365, 372–74). The Second Circuit similarly held, in the context of a medical student's Title II claim, that "Title II in its entirety exceeds Congress's authority under § 5." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 110 (2d Cir. 2001). But it subsequently explained that there may be circumstances where Congress did not exceed its authority (*Bolmer v. Oliveira*, 594 F.3d 134, 146–49 (2d Cir. 2010)) and, based on *Bolmer and Garcia*, the Second Circuit has noted "a growing fracture among the district courts . . . in their approach to determining whether Congress validly abrogated state sovereign immunity under Title II of the ADA." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 193 (2d Cir. 2015) (expressing "no position as to the question of whether Congress has validly abrogated sovereign immunity in the context of discrimination in access to public education on the basis of disability," but instructing the district court to consider *Georgia*'s application should it reach the issue on remand). Because the Sixth and Second Circuits have not considered the issue in light of more recent Supreme Court cases—i.e., *Lane* and *Georgia*—the undersigned does not find the foregoing cases persuasive.

for their football program by reason of his disability); *Toledo*, 454 F.3d at 39–40 (affirming district court's decision that state was not entitled to sovereign immunity based on undergraduate student's ADA claim, where student alleged disability discrimination and failure-to-accommodate); *Constantine*, 411 F.3d at 490 (holding state was not entitled to sovereign immunity as to law student's claim that professor discriminated against her on the basis of her disability); *Ass'n for Disabled Ams.*, 405 F.3d at 958–59 (reversing district court's Rule 12(b)(6) dismissal of undergraduate student's ADA claim that university failed to accommodate him, holding that state was not entitled to sovereign immunity). Their reasoning for doing so is persuasive: "Considering the pattern of unconstitutional disability discrimination described by the [Supreme] Court in *Lane,* [the undersigned] cannot say that Title II is 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Constantine*, 411 F.3d at 490 (quoting *Boerne*, 521 U.S. at 532). Thus, Congress's purported abrogation of immunity for Pickett's Title II ADA claims, in the context of the facts alleged herein in relation to public higher education, is valid.[21]

---

[21] A much easier, albeit no less uncertain, alternative exists for analyzing and resolving Pickett's ADA claims. Some district courts, in considering the sovereign immunity abrogation question, have relied on *Reickenbacker v. Foster*, 274 F.3d 974 (5th Cir. 2001) in holding that "the accommodation obligation imposed by Title II—as far as it relates to non-fundamental rights—exceeds that imposed by the Constitution and is not a valid abrogation of state sovereign immunity." *Glueck v. Nat'l Conf. of Bar Exam'rs*, Civil Action No. SA-17-CV-451-XR, 2017 WL 5147619, at *5 (W.D. Tex. Nov. 3, 2017). *Reickenbacker* found, in part, that the RA and Title II of the ADA, as a whole, were not "proportional and congruent to the legislative findings of unconstitutional discrimination against the disabled by the States," and therefore failed to abrogate state sovereign immunity. 274 F.3d at 983.

Three years after *Reickenbacker*, however, "the Supreme Court held that Title II *is* congruent and proportional—and *does* validly abrogate states' sovereign immunity—in 'cases implicating the fundamental right of access to the courts.'" *Block*, 952 F.3d at 617 (quoting *Lane*, 541 U.S. at 533–34). In its wake, the Fifth Circuit has yet to decide "whether the principle of *Lane* extends to cases involving other rights or, alternatively, whether [the] holding in *Reickenbacker* continues to control in such cases." *Bennett-Nelson*, 431 F.3d at 454; *see Block*, 952 F.3d at 617 ("We did not decide whether *Reickenbacker*'s holding remains valid in cases beyond that specific purview."); *Pace*, 403 F.3d at 277 n.14 ("The continuing validity of *Reickenbacker* following the Supreme Court's decision in . . . *Lane* . . . is uncertain. At the very least, its holding has been overruled as to Title II claims implicating a person's fundamental right of access to the courts."). As previously noted, this has resulted in some district courts determining that *Reickenbacker* continues to govern courts' consideration of the abrogation issue outside a Title II access-to-courts setting. *See, e.g., Glueck*, 2017 WL 5147619, at *5 (distinguishing *Lane* and concluding that "it is bound by the

The undersigned recommends that the district judge deny Defendants' Rule 12(b)(1) Motion with respect to Pickett's Title II claims for monetary damages based on Dr. Crenshaw's denial of additional time to submit assignments for feedback and her professors' failure to provide lecture notes (i.e., the failure-to-accommodate claims), as well as Pickett's disability discrimination claims. As stated earlier, the Supreme Court's pronouncements in cases such as *Lane* and *Georgia*, which were not available to the Fifth Circuit when it decided *Reickenbacker*, require a claim-by-claim examination of Title II's congruence and proportionality, rather than an evaluation of its general, holistic impact on the states. *See, e.g., Toledo*, 454 F.3d at 34–40 (conducting such analysis in regard to administration of higher education program (undergraduate) and finding a waiver of Puerto Rico's sovereign immunity); *Constantine*, 411 F.3d at 485–89 (conducting same analysis as to administration of higher education program (law school) and finding a waiver of Virginia's sovereign immunity); *Ass'n for Disabled Ams.*, 405 F.3d at 956–59 (following the same approach and concluding Title II waived state sovereign immunity for

---

decision in *Reickenbacker* that the accommodation obligation imposed by Title II—as far as it relates to non-fundamental rights—exceeds that imposed by the Constitution and is not a valid abrogation of state sovereign immunity"); *Dugger v. Stephen F. Austin State Univ.*, 232 F. Supp. 3d 938, 948 (E.D. Tex. 2017) (recognizing in disability discrimination claim brought by student against university that, following the Supreme Court's decisions in *Lane* and *Georgia*, the "Fifth Circuit has not reconsidered its decision in *Reickenbacker*" and, absent a squarely contrary ruling by the Supreme Court, lower courts are "bound by the Fifth Circuit's holding that section 504 of the [RA] under the Eleventh Amendment" does not abrogate state immunity).

Nevertheless, as discussed at pages 32–33 *supra*, many circuits now undertake the congruence and proportionality analysis to determine whether Congress's purported abrogation of sovereign immunity as to a particular class of conduct is nevertheless valid. *See, e.g., Bowers*, 475 F.3d at 550–56; *Toledo*, 454 F.3d at 34–40; *Guttman*, 669 F.3d at 1116–25; *Constantine*, 411 F.3d at 485–89; *Ass'n for Disabled Ams.*, 405 F.3d at 956–59. Because it appears *Lane* has, to some degree, implicitly modified or overruled in part *Reickenbacker* (*see Reickenbacker*, 274 F.3d at 977, recognizing binding nature of prior Fifth Circuit decision unless implicitly or expressly overruled by the Supreme Court) and requires examination "on a claim-by-claim basis," the undersigned has conducted the full *Boerne* analysis as to Pickett's public education disability discrimination claim. *See Lane*, 541 U.S. at 518–22; *see also Pace*, 403 F.3d at 277 n.14 (calling into question *Reickenbacker*'s analysis concerning the history and pattern of unconstitutional discrimination, observing that "after *Lane* [courts] do not look solely at the state level for a history and pattern of unconstitutional action; [they must] also examine discrimination by nonstate government entities"). **However, to the extent *Reickenbacker* remains binding precedent in this circuit, as applied to a student's disability discrimination claim against a university, the Court need not conduct the analysis set forth in the main text and it possesses no jurisdiction over Pickett's ADA claims.**

student's claims against university for failure to provide sufficient educational aids, e.g., language interpreters and note takers).

For the reasons stated in its analysis of Pickett's claims under the RA, the undersigned further recommends that the district judge grant-in-part Defendants' Rule 12(b)(6) Motion with respect to Pickett's claims for failure-to-accommodate based on the start time of the October 2, 2018, examination, and her requests to retake exams or substitute exam grades in course 5440, but deny the Motion as to Pickett's remaining ADA claims—i.e., those for failure-to-accommodate based on Dr. Crenshaw's denial of additional time to submit assignments for feedback and her professors' failure to provide lecture notes, as well as Pickett's disability discrimination allegations.

### D. Any claim based on harassment should be dismissed.

Defendants assert that, to the extent Pickett raises a claim for harassment, her claim is not legally cognizable. Defs.' Br. 12. The Court agrees.

The Fifth Circuit has not "recognized [RA or] ADA-based claims for disability-based educational harassment of students by instructors (i.e., non-peer-to-peer harassment) under a 'hostile learning environment' theory." *Campbell v. Lamar Inst. of Tech.*, CIVIL ACTION No. 1:14-cv-399, 2015 WL 12942498, at *6 (E.D. Tex. Aug. 13, 2015), *aff'd* 842 F.3d 375 (5th Cir. 2016); *see Bradyn S. v. Waxahachie Indep. Sch. Dist.*, Civil Action No. 3:18-CV-2724-L, 2019 WL 3859301, at *8 (N.D. Tex. Aug. 16, 2019) (observing that the Fifth Circuit has not "recognize[d] a cognizable claim under § 504 or the ADA for hostile environment claims based on allegations that a school district and its employees harassed a student," "declin[ing] to extend a hostile environment claim beyond what is established in" the Fifth Circuit's opinions, and therefore "determin[ing] that [student's] hostile environment claim based on harassment [by

school district and employees], alleged pursuant to § 504 and the ADA, is not cognizable in this Circuit"). Thus, to the extent Pickett attempts to assert claims against Defendants under the ADA or RA based on any purported harassment because of her disability, she cannot state a claim. *See Campbell*, 842 F.3d at 382 n.5 ("The district court correctly dismissed [the harassment] claims as not legally cognizable.").

### E. The individual Defendants are entitled to qualified immunity.[21]

The Court next considers whether Defendants Cherry and Evans, in their individual capacities, are entitled to qualified immunity as to Pickett's § 1983 claims for procedural and substantive due process violations. Defendants assert they are entitled to qualified immunity because Pickett "has not demonstrated that they violated any of her clearly established rights." Defs.' Br. 16. In Defendants' view, "Pickett pleads only conclusory statements that are insufficient to overcome qualified immunity," and Pickett does not "identify the actions that Drs. Cherry and Evans allegedly took that could have violated her clearly established rights." *Id.*

> *1. Defendants are entitled to qualified immunity as to Pickett's § 1983 procedural due process claim.*

To overcome the defense of qualified immunity, Pickett must plead facts demonstrating that Defendants violated her due process rights *and* that such right was clearly established at the time of the violation. *See Pearson*, 555 U.S. at 232. To establish a viable procedural due process claim, Pickett must demonstrate that she: (1) possesses a liberty or property interest in her continued enrollment in TTUHSC's DNP and/or FNP programs; and (2) Defendants deprived her of that protected interest without adequate process of law. *See Davis*, 882 F.2d at 972. As to

---

[21] Defendants Cherry and Evans have not filed an answer.

whether the law was "clearly established," the Fifth Circuit has explained that courts should evaluate the following:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that *every* reasonable official would understand that what he is doing violates [the law]. To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity. . . . Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law. . . . Although the Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that a case directly on point is required. Rather, existing precedent must have placed the statutory or constitutional question *beyond debate.* The *sine qua non* of the clearly-established inquiry is fair warning.

*Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (internal quotation marks, citations, and footnotes omitted).

As discussed in Section III.C.2 herein, Pickett has failed to demonstrate that she possesses a property interest in her continued enrollment. Thus, she has not stated a cognizable procedural due process claim. *See Pearson*, 555 U.S. at 232; *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021) (citation omitted). But even if Pickett could show a protectable property interest, she has not demonstrated that the process to which she was entitled, based on the protected property interest, was so clearly established such that every reasonable official would know that Defendants' actions violated that right. *See Perez v. Tex. A&M Univ. at Corpus Christi*, 589 F. App'x 244, 248 (5th Cir. 2014) (per curiam); *Smith v. Davis*, 507 F. App'x 359, 362 (5th Cir. 2013) (per curiam); *see also Kiser v. Garrett*, 67 F.3d 1166, 1174 (5th Cir. 1995) ("We need not decide whether the procedural protections of the due process clause of the Fourteenth Amendment require such disclosure, because even if such a right exists, it was not clearly established at the time of the state court custody proceedings . . . [and] appellees are [therefore] entitled . . . to qualified immunity"); *Davis v. Evans*, CIV A 97-0819, 1999 WL 544689, at *5 (E.D. La. July 26,

1999) (recognizing that where claimed constitutional right was not "sufficiently particularized to be 'clearly established,'" defendants were entitled to qualified immunity despite preventing the plaintiff from engaging in certain conduct and doing so without affording plaintiff a hearing). In sum, because Pickett has not demonstrated that the conduct in question violated a constitutional right, and that the right was "clearly established" at the time of the alleged violation, Defendants are entitled to qualified immunity. *See Pearson*, 555 U.S. at 232. The undersigned recommends that the district judge grant Defendants Cherry and Evans's Motion to Dismiss as to the procedural due process claims on this basis.

> 2. *Defendants are entitled to qualified immunity as to Pickett's § 1983 substantive due process claim.*

"The law regarding substantive due process rights in the context of higher education . . . is far from settled." *Shah*, 54 F. Supp. 3d at 696. "The Supreme Court has twice avoided deciding whether students at a public university have a substantive due process right to continued education," and "courts that have addressed the issue have almost universally upheld the academic decisions of public universities when challenged on substantive due process grounds." *Id.* (citations omitted).

Pickett has not alleged, and the Court has not found any authority suggesting, that the law is so clearly developed that all reasonable university officials would know that academically dismissing Pickett prior to notifying her of the appeal outcome, or prior to receiving her decision concerning whether she desired to remain in the DNP or FNP program, violated her clearly established substantive due process rights. Moreover, "because courts in this circuit exercise extreme deference to universities in the context of academic decisions" (*Shah*, 54 F. Supp. 3d at 700), Defendants Cherry and Evans could have reasonably believed that their actions did not violate Pickett's substantive due process rights, assuming she even possessed such a right. *See*

*Ewing*, 474 U.S. at 225–26. Because Defendants Cherry and Evans did not violate clearly established law, the undersigned recommends that the district judge grant Defendants Cherry and Evans's Motion to Dismiss on the basis of qualified immunity.

F. **Pickett's § 1983 claims for monetary damages against Defendants Cherry and Evans in their official capacities should be dismissed.[23] To the extent Pickett asserts ADA and RA claims against Defendants Cherry and Evans in their official capacities, however, such claims should remain.**

Pickett raises claims under the ADA, RA, and Due Process Clause against the individual Defendants—Cherry and Evans—in their official capacities. Compl. 13, 16, 18. Defendants Cherry and Evans argue that Pickett's § 1983 claims against them in their official capacities for money damages are barred by sovereign immunity. Defs.' Br. 18. Further, they contend that Pickett's ADA and RA claims against them in their official capacities must be dismissed because such claims merely represent a suit against TTUHSC, which is already a named defendant. *Id.* at 18–19.

Any § 1983 claim for monetary damages against Defendants Cherry and Evans in their official capacities is barred by the Eleventh Amendment. *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). This is because a suit against Defendants in their official capacities is, in effect, a suit against TTUHSC and the State of Texas. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (stating that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" (internal quotation marks omitted)); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)) (explaining that official capacity suits "generally represent only another way of pleading an action

---

[23] Defendants Cherry and Evans do not seek dismissal of the § 1983 claims against them in their official capacities for injunctive relief. *See* Defs.' Br. 1, 18–19 (arguing Pickett's due process claims are not plausible and alternatively, that "Pickett cannot maintain official capacity claims against the [individual] Defendants under any theories asserted," but failing to address Pickett's claims for injunctive relief).

against an entity of which an officer is an agent"). TTUHSC is immune from § 1983 claims for money damages. *See United States v. Tex. Tech Univ.*, 171 F.3d 279, 289 n.14 (5th Cir. 1999) ("The Eleventh Amendment cloaks Texas Tech University and Texas Tech University Health Sciences Center with sovereign immunity as state institutions."). Pickett "has not shown that the State of Texas has waived Eleventh Amendment immunity with regard to suits against TTUHSC [for monetary damages under § 1983], and § 1983 does not override the Eleventh Amendment." *Herrin v. Treon*, Civil Action No. 7:03-cv-0259-R, 2006 WL 2993360, at *1 (N.D. Tex. Oct. 19, 2006).

Turning to Pickett's ADA and RA claims against Defendants Cherry and Evans in their official capacities, in *McCarthy ex rel. Travis v. Hawkins*, the Fifth Circuit expressly held that under the *Ex parte Young* doctrine, the Eleventh Amendment does not bar suits against state officials in their official capacities for injunctive relief.[24] 381 F.3d at 413–14 (joining other circuits "in holding that Plaintiffs' *Ex parte Young* suit to enforce Title II can proceed," and explaining that "Defendants have been sued in their official capacities and are therefore representing their respective state agencies (which are proper Title II defendants) for all purposes except the Eleventh Amendment"). A court conducting an *Ex parte Young* analysis must: (1) conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"; and (2) "decide whether the official in question has a sufficient connection [to] the enforcement of the challenged act." *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019) (internal quotation marks and citations omitted).

---

[24] Defendants cite cases standing for the proposition that because official capacity suits represent an action against the entity of which the official is an agent, Pickett's official capacity claims are duplicative of her claim against TTUHSC. Defs.' Br. 18 nn.127–28. The cases Defendants cite, however, discuss duplicity in the context of § 1983 claims or claims against municipal liabilities. *See, e.g., Lehmann v. Hill Cnty.*, Civil Action No. W–09–CA–086, 2009 WL 10669158, at *1 (W.D. Tex. June 25, 2009); *Jenkins v. Bd. of Educ. of Hous. Indep. Sch. Dist.*, 937 F. Supp. 608, 613 (S.D. Tex. 1996). They are therefore distinguishable.

Here, Pickett contends Defendants failed to accommodate her and discriminated against her on the basis of a disability in violation of the ADA and RA. Further, she seeks injunctive relief to remedy the alleged improprieties. "Thus, the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *McCarthy*, 381 F.3d at 417 (internal quotation marks and citation omitted); *cf. Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 322 (5th Cir. 2008) (observing that "this circuit has always treated *Ex parte Young* as an appropriate vehicle for pursuing reinstatement to a previous job position"—i.e., that a request for reinstatement, such as Pickett seeks here, constitutes prospective injunctive relief). Dismissal of the official capacity ADA and RA claims for injunctive relief is therefore inappropriate.[24]

## G. Leave to Amend.

Pickett has not requested leave to amend her Complaint. Nevertheless, the Fifth Circuit has observed that "district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Pickett has not previously amended her Complaint, and Defendants have not filed an answer. But as to Pickett's § 1983 due process claims against Defendants Cherry and Evans in their individual capacities, as well as any claim for disability harassment, amendment would be futile. Even if Pickett stated a claim upon which relief could be granted as to the alleged procedural due process violations, she could not demonstrate that the law in question was clearly established, as discussed above. Moreover, the Fifth Circuit has not recognized a cause of action based on disability harassment under the RA and ADA. The undersigned therefore recommends that the

---

[24] As discussed above, Defendants are not entitled to sovereign immunity on Pickett's ADA and RA claims. At this stage, any dismissal of official capacity claims for monetary damages is also inappropriate.

district judge dismiss with prejudice Pickett's § 1983 due process claims against Defendants Cherry and Evans in their individual capacities, as well as any claim for disability harassment.

As to Pickett's § 1983 claims for monetary damages against Defendants Cherry and Evans in their official capacities, leave to amend would similarly be futile. But the undersigned recommends dismissal of those claims without prejudice. The Fifth Circuit has "has repeatedly referred to the Eleventh Amendment's restriction in terms of subject matter jurisdiction." *Tex. Tech Univ.*, 171 F.3d at 285 n.9 (citations omitted). Thus, Pickett's claims that are barred by Eleventh Amendment immunity should be dismissed without prejudice for lack of subject-matter jurisdiction. *See, e.g., Anderson v. Jackson State Univ.*, 675 F. App'x 461, 464 (5th Cir. 2017) (per curiam) (citing *Tex. Tech Univ.*, 171 F.3d at 285 n.9).

The undersigned does recommend, however, that Pickett be granted leave to amend her RA and ADA failure-to-accommodate claims *only* as to her allegations concerning the start time of the October 2, 2018, examination, and her requests to retake exams or substitute exam grades in course 5440.

## IV. <u>Recommendation</u>

For the foregoing reasons, the undersigned recommends that the United States District Judge **DENY** Defendants' Motion to Dismiss under Rule 12(b)(1) and (6) as to Pickett's RA and ADA claims for (1) disability discrimination and (2) failure-to-accommodate based on Dr. Crenshaw's denial of additional time to submit assignments for feedback and her professors' failure to provide lecture notes. As to Pickett's RA and ADA claims for failure-to-accommodate based on the start time of the October 2, 2018, examination, and her requests to retake exams or substitute exam grades in course 5440, however, the undersigned recommends that the United States District Judge (1) **GRANT** Defendants' Rule 12(b)(6) Motion, and (2) dismiss Pickett's

42

claims without prejudice. Should Pickett elect to amend her claims *only as to the foregoing failure-to-accommodate allegations* after reviewing these findings and conclusions, she must do so **within the fourteen days allotted for objections to this recommendation**. If Pickett files an amended complaint within the prescribed time period, the undersigned recommends that the United States District Judge **DENY as moot** Defendants' Motion as to Pickett's claims for failure-to-accommodate based on the start time of the October 2, 2018, examination, and requests to retake exams or substitute exam grades in course 5440.

The undersigned further recommends that the United States District Judge **GRANT** Defendants' Motion and dismiss with prejudice Pickett's (1) disability harassment claim and (2) 42 U.S.C. § 1983 claims against Defendants Cherry and Evans in their individual capacities. The undersigned further recommends that the United States District Judge **GRANT** Defendants' Rule 12(b)(1) Motion and dismiss without prejudice Pickett's § 1983 claims for money damages against Defendants Cherry and Evans in their official capacity.

## V.     Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual

findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: July __30__, 2021.

_____
**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**